TUTTLE & ASSOCIATES, INC., APPELLANT, V. H. LEE GENDLER, TRUSTEE, ET AL., DEFENDANTS AND THIRD-PARTY PLAINTIFFS; CHADSEY ARCHITECTS, INC.; AND AMERACORP, INC., ET AL., THIRD-PARTY DEFENDANTS, APPELLEES.

467 N.W.2d 881

Filed April 12, 1991.    No. 88-934.

Daniel W. Evans, of Domina, Gerrard, Copple & Stratton, P.C., for appellant.

Irving B. Epstein, of Gross & Welch, for appellees Gendler and trust.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

FAHRNBRUCH, J.

Tuttle & Associates, Inc. (Tuttle), appeals a summary judgment wherein the district court for Douglas County dissolved a construction lien Tuttle had placed on real estate for its engineering services.

After finding there was no issue of material fact existing relative to an alleged agency relationship between the owner vendor of the real estate involved and the purchaser which had contracted for Tuttle's engineering services, the trial court entered summary judgment in favor of the owner vendor. A construction lien Tuttle had filed against the vendor's real estate was dissolved. We affirm.

In considering the evidence on a motion for summary judgment, both this court and the trial court must determine whether there is any genuine issue as to any material fact, whether the ultimate inferences to be drawn from those facts are clear, and whether the moving party is entitled to judgment as a matter of law. *R.A.S., Inc. v. Crowley*, 217 Neb. 811, 351

N.W.2d 414 (1984). See, also, *De Los Santos v. Great Western Sugar Co.*, 217 Neb. 282, 348 N.W.2d 842 (1984).

Summary judgment is proper when the pleadings, depositions, admissions, stipulations, and affidavits in the record show that no genuine issue exists as to any material fact or as to the ultimate inferences that may be drawn from any material fact and that the moving party is entitled to judgment as a matter of law. Neb. Rev. Stat. § 25-1332 (Reissue 1989); *Joseph Heiting & Sons v. Jacks Bean Co.*, 236 Neb. 765, 463 N.W.2d 817 (1990); *First Nat. Bank of Omaha v. Chadron Energy Corp.*, 236 Neb. 199, 459 N.W.2d 736 (1990).

A party moving for summary judgment has the burden of showing that no genuine issue as to any material fact exists. Thereafter, the burden of producing contrary evidence shifts to the party opposing the motion. *West Town Homeowners Assn. v. Schneider*, 231 Neb. 100, 435 N.W.2d 645 (1989). A vendor of real estate is entitled to summary judgment in a construction lien foreclosure if the vendor shows that an essential element of the plaintiff's cause of action is nonexistent. See *Bone International, Inc. v. Brooks*, 304 N.C. 371, 283 S.E.2d 518 (1981).

In appellate review of an order granting a summary judgment, the Supreme Court views the evidence in a light most favorable to the party against whom the judgment is granted. *Joseph Heiting & Sons, supra.*

In the light most favorable to Tuttle, the record reveals the following: H. Lee Gendler is the president of Marathon Realty Corporation, which is engaged in the business of buying and selling real estate. In 1974, Gendler and his brother, as individuals, bought 170 acres of land located in Douglas County, Nebraska. They subsequently sold an interest in this property to a group of investors and retained a one-third interest. Gendler became trustee of the property. In the late 1970's through the early 1980's, the investors subdivided and sold a majority of the acreage as single-family lots. By 1984 only five large individual lots remained, three of which were owned by the trust and all of which were suited and zoned for multifamily dwellings. Various negotiations for the sale of these lots were initiated in 1978. Written proposals were made and

plans drawn up, but no proposal was accepted until 1984.

On October 3, 1984, Gendler, as trustee, sold one lot and a portion of three others, comprising approximately 21 acres, to Ameracorp, Inc., a Texas corporation, by a land contract. The sale's closing was to be no later than April 3, 1985. The contract further provided:

SECTION IV - <u>CONDITIONS OF CLOSING:</u>

(A) Closing shall be subject to the approval of Purchaser of the following:

. . . .

2. <u>ZONING:</u> Seller warrants and represents that the property is being zoned for multi-family residential development under which 20.1 units of the configuration intended to be built by Purchaser and disclosed to Seller on attached Schedule D can be built per acre, with total density to be not less than 424 units. Purchaser agrees to a reduced site plan with a minimum of 18 units per acre should city require lower density than the attached plat. Purchaser shall submit complete documentation for a planned unit development [PUD] no later than October 16, 1984. Purchaser shall simultaneously file Application with the City of Omaha for approval of planned unit development, and pursue with due diligence.

A PUD entails a legal description, a topographic map, a general site plan, and a utility site plan. It is essentially a "footprint" of the buildings and is required by the city of Omaha whenever multiple buildings are to be built on a single lot. The developer is required to build exactly as the plans indicate. One of the zoning changes involved was a change from R-7 to R-8 PUD. Both R-7 and R-8 are residential multidwelling zoning, but vary slightly as to setbacks and front yard requirements.

The rezoning and PUD applications were filed by Ameracorp on October 17, 1984. Ameracorp's earnest money had been received upon execution of the contract and in December 1984. On April 5, 1985, an addendum to the contract was executed, wherein the closing date was extended to August 3, 1985. For delaying the closing and for keeping the property

off the market, Ameracorp paid additional earnest money plus three monthly installments of $5,000. The addendum further provided that Ameracorp's failure to meet the new closing date would result in forfeiture of all funds it had paid to Gendler as trustee.

Although the closing date passed without Ameracorp acting, Ameracorp continued the monthly payments for September and October 1985. On October 14, Gendler notified Ameracorp that if it did not close by October 31, the contract would be canceled because of Ameracorp's failure to perform. The contract was subsequently terminated. Thereafter, Gendler, who regarded the PUD designation received by Ameracorp as an encumbrance, took steps in 1988 to have it removed. According to Gendler, the particular plan was not highly regarded because it was the same plan as another Ameracorp project which had been a poor market performer. The existence of the PUD represented a stumbling block to prospective buyers of the property.

From the early to mid-1980's, Ameracorp was building, in the process of building, or negotiating projects totaling 3,000 apartment units in seven states, including Nebraska. Chadsey Architects, Inc. (Chadsey), of Oklahoma, was the architect for all of Ameracorp's projects, including the project in question, known as Apple Creek of Omaha II, or Apple Creek Blondo (Blondo). Chadsey was employed and was to be paid by Ameracorp.

In late 1984, Chadsey, together with Al C. Young & Associates (Young), civil engineers, entered into a joint agreement with Ameracorp for architectural and engineering services for various multifamily projects. Between June 5 and August 31, 1985, pursuant to the agreement, Young's successor in interest, Tuttle, an Oklahoma corporation, performed boundary surveying, topographic surveying, and civil engineering design for the Blondo project. Based upon the Chadsey/Young-Ameracorp agreement fee schedule, Tuttle billed Ameracorp $42,522.04 for its services. Upon failing to receive any money for the Blondo project, Tuttle, on October 2, 1985, filed a construction lien against the Blondo property. Thereafter, Tuttle sued Ameracorp and its president, Steve

Holsey. Although Tuttle obtained judgments against Ameracorp and Holsey, it was unable to collect them because, in September 1986, Ameracorp filed a petition in bankruptcy and Holsey could not be located.

On September 28, 1987, Tuttle filed a petition in equity in the district court for Douglas County against Gendler, as trustee; the trust; and Chadsey to foreclose the construction lien, alleging, inter alia, that (1) Ameracorp was required to obtain a zoning designation change under the real estate contract; (2) Ameracorp, acting as agent for Gendler, requested Tuttle to perform engineering services which were subsequently ratified by Gendler; and (3) the real estate was improved and benefited through the provision of the engineering services. Chadsey disclaimed and disavowed any interest in the real estate. Depositions were taken of Gendler; Jeffrey Tuttle, owner of Tuttle & Associates; and Brent Baker, former vice president of Ameracorp.

On September 1, 1988, Gendler and the trust moved for summary judgment, which motion was granted on October 7. The district court dissolved the construction lien and dismissed Tuttle's petition. Tuttle timely appealed to this court.

Tuttle's three assignments of error combine to allege that the district court erred (1) in finding that the existence of an agency relationship between Ameracorp and Gendler was not a question of material fact and (2) in setting the amount of the supersedeas bond.

In support of its first assignment of error, Tuttle claims that Section IV of the Gendler-Ameracorp written contract contained a requirement imposed by Gendler upon Ameracorp to obtain a PUD zoning designation for the real estate sold by Gendler to Ameracorp. Tuttle maintains that "requirement" constituted Ameracorp as Gendler's agent to obtain engineering services in connection with the PUD zoning.

The Nebraska Construction Lien Act, Neb. Rev. Stat. §§ 52-125 et seq. (Reissue 1988), under which Tuttle's cause of action is premised, provides for the attachment and enforceability of a lien against real estate in favor of a person furnishing services or materials under a real estate improvement contract. § 52-126. A real estate improvement

contract includes an agreement to perform services such as the preparation of plans, surveys, and engineering plans for any change in the physical condition of the land whether or not used incident to producing a change in physical condition of the real estate. § 52-130(1)(f). Under the act, a "claimant" is a person having a right to a lien upon real estate and includes his or her successor in interest, and a "contracting owner" is a person who owns real estate and who, personally or through an agent, enters into a contract, express or implied, for the improvement of the real estate. § 52-127(1) and (3).

The construction of a written contract, if needed, is a question of law for the court. *International Harvester Credit Corp. v. Lech*, 231 Neb. 798, 438 N.W.2d 474 (1989). As applied to the facts of this case, an agency relationship is a fiduciary relationship, resulting from one entity's manifested consent that another entity may act on behalf and subject to the control of the entity manifesting such control and, further, resulting from the other entity's consent to so act. See *Dunn v. Hemberger*, 230 Neb. 171, 430 N.W.2d 516 (1988).

Contract Section IV(A)2 can be divided into four parts:

ZONING: [1] Seller warrants and represents that the property is being zoned for multi-family residential development under which 20.1 units of the configuration intended to be built by Purchaser and disclosed to Seller on attached Schedule D can be built per acre, with total density to be not less than 424 units. [2] Purchaser agrees to a reduced site plan with a minimum of 18 units per acre should city require lower density than the attached plat. [3] Purchaser shall submit complete documentation for a planned unit development no later than October 16, 1984. Purchaser shall simultaneously file Application with the City of Omaha for approval of planned unit development, and [4] pursue with due diligence.

The first portion is for the benefit of Ameracorp. The condition precedent to closing is that the property will be zoned for Ameracorp's intended use and configuration. The second portion is for the benefit of both parties, wherein Ameracorp will still purchase the property even if the approved density drops to 18 units per acre, but will not be required to purchase

the property if the density drops below this level. The third portion appears to be merely an understanding between the parties that Ameracorp is responsible for the documentation. This appears appropriate, since a PUD is based on a particular configuration proposed by the developer. The fourth and final portion of the zoning provision is for the benefit of Gendler, who did not want to keep the property off the market for a long time because of the high interest in apartment real estate at that point in time. Nothing in this paragraph indicates that Gendler controlled the actions of Ameracorp or that Gendler consented to Ameracorp's acting on the trust's behalf. Ameracorp could have submitted to the city any initial design it wanted, and it could have provided any documentation in support of the design. Gendler was never shown the documentation, nor was he even aware that Tuttle existed prior to the present action.

Tuttle argues that the rezoning and PUD applications were required by Gendler, who would enjoy the benefit of fulfillment of the condition precedent and payment of the purchase price. The argument is specious. The requirement for rezoning was for the benefit of Ameracorp. If rezoning could not be obtained to the satisfaction of Ameracorp, Ameracorp was not required to complete the sale.

Under Section X(B) of the contract, the burden was placed upon Ameracorp to establish, within 90 days of the execution of the contract, that *the property was "suitable for multi-family residential development free of engineering, drainage, compaction or similar costs that may be unacceptable to Purchaser in purchaser's sole discretion"* and, under Section X(C), to obtain within 180 days from the execution of the contract, *"at Purchaser's expense, site plan approval, sewage and water tap-on permits and a building permit from appropriate governmental authorities or agencies."* (Emphasis supplied.) Section X(E) provided: "After January 15, 1985, *unless the Purchaser has notified the Seller of his inability to satisfy"* the foregoing burdens together with other conditions precedent, Ameracorp "shall be deemed to have waived [its] rights under . . . Section X." (Emphasis supplied.)

The land contract was entered into on October 3, 1984. The engineering contract between Ameracorp and Chadsey/Young,

the contract under which Tuttle is claiming compensation, was entered into on December 17, 1984. It is true that in an addendum to the land contract of sale between Gendler and Ameracorp dated April 5, 1985, Ameracorp waived the conditions precedent in Section X of the land contract. However, by April 5, 1985, Ameracorp had already waived its *rights* under Section X because of Section X(E) of the land sale contract, which provided: "After January 15, 1985, unless the Purchaser has notified the Seller of his [purchaser's] inability to satisfy conditions precedent, Purchaser shall be deemed to have waived his rights under this Section X."

It is abundantly clear from both the written land contract of sale and the written addendum to the contract that Gendler never agreed to pay for any engineering services. Nor can the written land contract or the written addendum be read or interpreted to establish that Gendler appointed Ameracorp as the trust's agent to contract for engineering services. Because of the language in Section X(B) and (C), the only inference that can be drawn from the land contract is that the burden was upon Ameracorp to pay for any engineering fees for which it contracted and that in contracting for those services it was not acting on behalf of Gendler.

The Gendler-Ameracorp contract is similar to the contract in *Wilbur Smith & Associates, Inc. v. F & J, Inc.*, 34 Conn. Supp. 638, 382 A.2d 541 (1977), cited by Gendler, wherein the agreement between the vendor and purchaser provided that "all necessary plans and applications for the approval of group dwellings by the city plan commission, building permits and other site plan approvals were to be at the expense of the [purchaser]." *Id.* at 639, 382 A.2d at 542. The agreement was conditioned on the purchaser's receiving these approvals and permits. The plaintiff, an engineering firm, entered into a contract with purchaser to prepare subdivision plans and topographic surveys. It subsequently filed and perfected a mechanic's lien on the land owned by the vendor. The vendor had actual notice of the services rendered on behalf of the purchaser. The court held that mere knowledge on the part of the vendor that engineering work was being performed on the land did not amount to consent necessary to support a lien filed

under the Connecticut mechanic's lien law. The court also held that there was no evidence the vendor authorized the purchaser to incur any obligation at its expense, that the purchaser-engineer contract was never approved or consented to by the vendor, and that the purchaser was never the agent of the vendor.

The Gendler-Ameracorp contract factually differs from the contracts in cases relied upon by Tuttle. The contract between the vendor and purchaser in *Knudson v. Bland*, 253 Iowa 614, 113 N.W.2d 242 (1962), was more than a mere land sale contract. The vendor helped finance the development of the land for which the vendor was to receive a higher return than the original market value of the bare land. The contract was for the sale of 10 acres which had a fair value of $200 per acre; however, the total contract sales price was $25,000. Upon request of the purchaser, the vendor would deed an individual lot to the purchaser. When the purchaser had obtained outside financing, the purchaser would join in a warranty deed of conveyance back to the vendor. Title would remain with the vendor until the construction on the lot was completed. Money was paid by the purchaser to the vendor upon sale of the improved lot. Evidence was also adduced in *Knudson* that the vendor entered into a contract with a service supplier who had previously entered into a contract with the purchaser to grade and move earth on the tract of land in question. Under this vendor-service supplier contract, the vendor admitted to selling the land to the purchaser for development purposes and agreed to pay half of the service contract in the event the purchaser failed to pay. These facts combined sufficiently for the court to find that the vendor "required" the purchaser to improve the realty.

In *Sheehy v. Fulton*, 38 Neb. 691, 57 N.W. 395 (1894), this court similarly ruled on a land sale contract factually analogous to that in *Knudson*. We held that in order to subject the interest in property of a vendor to a mechanic's lien for improvements erected thereon by the purchaser, the executory contract for the sale of land with the purchaser must be of such character as to *require* the construction of the improvements and to constitute the purchaser as the vendor's agent in such construction. Under

the contract in *Sheehy*, the vendor contracted to sell a lot to the purchaser for $5 cash, with the remainder of the purchase price to be paid at a later date. The parties understood that a building was to be erected upon the unimproved lot and that the remainder of the purchase price was to be paid from the proceeds of a loan previously negotiated or which could be made upon security of the property, but which could not be consummated until excavations for the building were made and the foundations were in place. There was also evidence that the vendor had the purchaser change contractors. This was to speed up completion of the project to meet the date for the final payment of the purchase price. Finally, the evidence tended to show a supplier had refused to extend credit to the purchaser, that the vendor accompanied the purchaser to the supplier, and that the vendor signed a written agreement wherein he would protect the supplier on any material he furnished the purchaser. Calling this a "border line" case, this court found that, based on the above facts, a "distinct arrangement" existed between the vendor and purchaser such that it fell within the rule subjecting the vendor's property interest to the mechanics' liens.

This court, in *Guiou v. Ryckman*, 77 Neb. 833, 837, 110 N.W. 759, 760 (1906), held that "where the vendor and [purchaser] cooperate together in plans for the erection of improvements upon real estate covered by their agreement, the interest of the vendor, as well as that of the [purchaser], is bound for the payment of liens for labor and material which have been furnished for such improvements." Unlike the contract in the case at bar, the *Guiou* contract allowed the purchaser the right to enter the premises and begin construction of houses 30 days after signing of the contract, without making time of the essence for closing. Similar to the above cases, the vendor in *Guiou* also assisted in the financing under that contract. If the purchaser was unable to secure a loan sufficient to erect the houses, the vendor would take a second mortgage on both the houses and the lots.

In the case at bar, there is no evidence that Gendler controlled the actions of Ameracorp. Nor is there any evidence that Gendler assisted or participated in the financing of the sale,

participated in control of the land's improvements, or acted as surety for any purchaser-supplier contracts.

Before and after the contract was executed, Gendler did contact Ameracorp and its subcontractors concerning various subjects of construction. In July 1984, Gendler advised the Ameracorp representative that other developers were interested in the excavated dirt from the site. Gendler suggested that Ameracorp involve an architect early to determine how much dirt it could afford to have removed. In August of the same year, Gendler sent to Chadsey the administrative procedure for a PUD in Omaha and to Thompson, Dreessen & Dorner (Thompson), Ameracorp's engineers and land surveyors, a preliminary topographic map of the lots. In October, Gendler coordinated with Chadsey and Thompson the exact configuration of the property to be conveyed. In December, Gendler determined that an administrative lot split would be obtained to facilitate "a good clean title policy." All of these actions clearly demonstrate only that Gendler acted as any other seller by assisting in the closing of the sale. The information provided, much of which went to out-of-state entities, merely helped coordinate the process for Gendler's purchaser. There is no indication that Gendler even partially controlled the improvements or agreed to pay for any engineering fees.

The evidence in this case establishes there was no "distinct arrangement," as described in *Sheehy v. Fulton*, 38 Neb. 691, 57 N.W. 395 (1894), or "requirement," as in *Knudson v. Bland*, 253 Iowa 614, 113 N.W.2d 242 (1962). Tuttle does not argue that Gendler expressly consented to Ameracorp's acting on the trust's behalf or that Ameracorp consented to so act, the other essential elements of an agency relationship. On the latter point, there is evidence that Ameracorp did not consent. Baker, the former vice president of Ameracorp, testified that the zoning request was made for the benefit of Ameracorp and that Ameracorp would never act on behalf of the vendor in any case.

A review of Jeffrey Tuttle's testimony reflects that his opinion that an agency relationship existed between Gendler and Ameracorp was based upon the written contract of sale between those parties. As previously stated, the construction of

a written contract is a question of law for a court to decide. Mere conclusions, opinions, and beliefs are not sufficient to show that a genuine issue of fact exists.

Gendler's evidence negated the essential element of agency in Tuttle's cause of action. The record presents no genuine issue of material fact concerning the element of agency, and Gendler and the trust, as movants, are entitled to judgment as a matter of law. Tuttle's first assignment of error is without merit.

In Tuttle's second assignment of error, it claims that the court abused its discretion by setting the amount of the supersedeas bond in the amount of Tuttle's claimed lien of $42,522.04, rather than in the amount of the costs. Tuttle argues that it was prejudiced by the lower court's abuse of discretion in setting the amount of the bond because it was unable to file a bond in the amount of the lien. This court need only decide whether Tuttle was prejudiced if it was successful on the first assignment of error. Having determined that issue adversely to Tuttle, we find that the second assignment of error is without merit.

As the district court sustained Gendler and the trust's motion for summary judgment and this court now affirms the result, the dismissal of the construction lien was proper. See *Bulger v. McCourt*, 179 Neb. 316, 138 N.W.2d 18 (1965).

The district court's order of judgment is affirmed.

AFFIRMED.