BRENT FLYNN, NATURAL FATHER AND LEGAL GUARDIAN AND NEXT FRIEND OF JASON FLYNN, APPELLANT, V. LAWRENCE CHARLES BAUSCH, M.D., APPELLEE.

469 N.W.2d 125

Filed May 10, 1991.   No. 88-1079.

Hal W. Anderson, of Berry, Anderson, Creager & Wittstruck, P.C., for appellant.

Fredric H. Kauffman, of Cline, Williams, Wright, Johnson & Oldfather, for appellee.

BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

The infant appellant, Jason Flynn, acting by and through Brent Flynn, his natural father, legal guardian and next friend, brought this medical malpractice action against the appellee, Lawrence Charles Bausch, M.D., who successfully moved for a summary judgment resulting in dismissal of the action. The infant, claiming the record presents a genuine issue of material fact concerning the existence of a physician-patient relationship between himself and Bausch, assigns the ruling as error. We affirm.

The infant was born February 4, 1986, at St. Elizabeth Community Health Center of Lincoln, and he and his mother, Linda Flynn, were released from the hospital on the 6th. On February 8, the mother took the infant to Harlan C. Shriner, Jr., M.D., because she was concerned that the infant might have developed an infection after his circumcision.

Shriner noted the infant appeared "[n]ormal otherwise but extremely yellowish green." The infant also had a rash in the areas of his back, buttocks, and upper legs, which apparently suggested bleeding into the tissues. Shriner performed a test to determine the level of the infant's bilirubin (a bile pigment, Dorland's Illustrated Medical Dictionary 167 (26th ed. 1981)).

The laboratory technician reported that the reading on the machine was above 30, the highest reading the machine was capable of making. After the examination in his office, Shriner was concerned about extreme jaundice (a condition characterized by high concentrations of bilirubin in the blood and its deposition in the skin, Dorland's, *supra* at 688) and the rash, and immediately admitted the infant into the neonatal intensive care unit at St. Elizabeth, where, at 1 p.m., various tests were ordered.

At some point within the next hour and a half, Shriner had a brief conversation with Bausch in the nursery, where Bausch was attending a patient in the crib next to the infant's. Shriner wanted Bausch's opinion "as to what . . . was going on and what might be a reasonable approach." Shriner considered this to be an informal consultation, but Bausch stated that in his judgment, it was not in any way a consultation, claiming that at St. Elizabeth, 90 percent of consultations follow a procedure involving written orders.

Shriner could not recall what specific information he gave Bausch, other than the fact that he "had a very jaundiced baby" with a rash and a history of slight fever. According to Shriner, the two agreed that more information was needed and that Shriner was to "get back" with Bausch "if the information indicated something different than what was going on at that point." The infant's claim that Shriner and Bausch had an additional conversation in the nursery following a particular test is unsupported by the portion of the record which he cites, and our independent review of the record finds no support for this assertion. There is deposition testimony by a nurse, stating that a second nurse told her that Shriner spoke with Bausch. Other than the deponent's belief that this was a telephone discussion, there is nothing to indicate that this was a second conversation. In fact, the deponent was unaware that Bausch had ever seen the infant. In any event, the statement of the second nurse recounted by the deponent is hearsay and, as such, would be inadmissible.

According to Bausch, Shriner informed him that he had an infant who was jaundiced or appeared unusual, with a rash. Bausch also recalled that Shriner gave him some "sketchy

information" about the mother being discharged early from the hospital, that "the bilirubin had run off the meter at his office," that he had obtained another bilirubin test at the hospital after the infant was admitted, and that he had ordered a series of other tests. Bausch did not look at the infant's chart or any test results, nor was he aware of the infant's name.

Although he looked at the infant, Bausch stated that he did not "examine" him. However, Bausch was able to observe that the infant appeared to be clinically jaundiced and recalled seeing a rash on his buttocks and trunk. Bausch advised Shriner to wait pending the outcome of the ordered tests before performing an exchange transfusion, but made no comment as to how long to wait.

A third physician expressed the view that the primary issue was to treat the infant's high bilirubin level and that a second issue was to learn whether he was "septic" (a condition produced by the decomposition of microorganisms, Dorland's, *supra* at 1189) and to treat that. According to this physician, the two conditions were not dependent upon each other and could and should have been treated independently and vigorously. The infant alleges he suffered brain damage and other injuries which would have been avoided had he received a timely diagnosis and exchange transfusion.

Generally, a physician's duty to exercise the required skill or standard of care arises out of the physician-patient relationship. See, e.g., *Oliver v. Brock*, 342 So. 2d 1 (Ala. 1976); *Rainer v. Grossman*, 31 Cal. App. 3d 539, 107 Cal. Rptr. 469 (1973); *Podvin v. Eickhorst*, 373 Mich. 175, 128 N.W.2d 523 (1964); *Ingber v. Kandler*, 128 A.D.2d 591, 513 N.Y.S.2d 11 (1987); *Easter v. Hospital*, 303 N.C. 303, 278 S.E.2d 253 (1981); *Fabian, et ux., Aplnts. v. Matzko, et al.*, 236 Pa. Super. 267, 344 A.2d 569 (1975); *Childs v. Weis*, 440 S.W.2d 104 (Tex. Civ. App. 1969); *Lyons v. Grether*, 218 Va. 630, 239 S.E.2d 103 (1977). While the relationship is often described as contractual in nature, based upon the express or implied consent of both physician and patient, 1 S. Pegalis & H. Wachsman, American Law of Medical Malpractice § 2:3 (1980), we have held that absent fraud or misrepresentation, consent to medical treatment is presumed, *Jones v. Malloy*, 226 Neb. 559, 412

N.W.2d 837 (1987). The relationship can therefore be said to arise when the physician undertakes treatment of the patient. See M. McCafferty & S. Meyer, Medical Malpractice Bases of Liability § 1.02 (1985). This relationship engenders a duty to the patient and, in certain cases, to third parties who may be subject to serious risks associated with a patient's treatment or condition. See, e.g., *Watkins v. U.S.*, 589 F.2d 214 (5th Cir. 1979) (plaintiff injured in automobile accident attributed in part to physician's negligent prescription of Valium to patient driver); *Gooden v. Tips*, 651 S.W.2d 364 (Tex. App. 1983) (facts similar to *Watkins*); *Skillings v. Allen*, 143 Minn. 323, 173 N.W. 663 (1919) (parents who caught scarlet fever from child after being informed by physician that they could take child home without risk of infection stated cause of action against physician); *Davis v. Rodman*, 147 Ark. 385, 227 S.W. 612 (1921); *Jones v. Stanko, Admx.*, 118 Ohio St. 147, 160 N.E. 456 (1928); *Edwards v. Lamb*, 69 N.H. 599, 45 A. 480 (1899). See, also, 1. S. Pegalis & H. Wachsman, *supra* § 2:20, and cases cited.

Some courts, however, have held that a physician-patient relationship is not a necessary prerequisite for sustaining an action in medical malpractice, and have grounded liability upon the traditional duty analysis for negligence. See, e.g., *Davis v. Weiskopf*, 108 Ill. App. 3d 505, 439 N.E.2d 60 (1982). Since nothing is called to our attention in the facts of the case before us which would support imposition of such a duty in the absence of a physician-patient relationship, we need not now determine the general question of whether liability can ever exist absent an underlying physician-patient relationship.

Summary judgment is appropriate when the pleadings, depositions, admissions, stipulations, and affidavits in the record show that no genuine issue exists as to any material fact or as to the ultimate inferences that may be drawn from any material fact and that, as a matter of law, the moving party is entitled to judgment. *Ruwe v. Farmers Mut. United Ins. Co., post* p. 67, 469 N.W.2d 129 (1991); *Millard v. Hyplains Dressed Beef*, 237 Neb. 907, 468 N.W.2d 124 (1991); *Tuttle & Assoc. v. Gendler*, 237 Neb. 825, 467 N.W.2d 881 (1991). Moreover, a party moving for summary judgment has the

burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law if the evidence presented for summary judgment remains uncontroverted. After the moving party has shown facts entitling it to judgment as a matter of law, the opposing party has the burden to present evidence showing an issue of material fact which prevents a judgment as a matter of law for the moving party. *Tuttle & Assoc. v. Gendler, supra; Eastroads, Inc. v. City of Omaha*, 237 Neb. 837, 467 N.W.2d 888 (1991). The propriety of the summary judgment in this case therefore rests on whether the record, when viewed in the light most favorable to the infant, shows that there was no physician-patient relationship between him and Bausch. In other words, the judgment was properly granted if the record shows that Bausch did not undertake any part of the care and treatment of the infant.

The existence of a physician-patient relationship is normally a question of fact; however, the party claiming evidence of the relationship must offer some facts to show that the relationship came into existence. *Oliver v. Brock*, 342 So. 2d 1 (Ala. 1976). In *Oliver*, the Supreme Court of Alabama upheld a summary judgment in favor of a physician because there was no evidence a physician-patient relationship existed. The physician in *Oliver*, one Brock, had a phone conversation with Oliver's treating physician. The treating physician called Brock about a different patient and made "a casual reference to the condition of [Oliver] in the abstract, without mentioning her name," and Brock told the physician that the treatment seemed to be correct. *Id.* at 4. The Alabama court concluded: "There is nothing in this record to support the allegation that . . . Brock took any part in the treatment of . . . Oliver, by way of advising her physicians, or otherwise." *Id.* at 5.

In *Rainer v. Grossman*, 31 Cal. App. 3d 539, 107 Cal. Rptr. 469 (1973), a treating physician presented his patient's case history and x rays to a lecture group of 20 to 50 physicians. Grossman, a physician and university professor of medicine, was the lecturer. He, together with most of the other physicians present, expressed the opinion that surgery was indicated in

cases like the one presented. The treating physician later recommended surgery to his patient, and the patient was so treated. The patient later claimed that the surgery was unnecessary and constituted malpractice and that Grossman's opinion was relied upon by the treating physician. The court held that the professor's pedological discussion did not create a duty toward the treating physician's patient.

Notwithstanding Bausch's advice that an exchange transfusion be delayed pending the development of further data and his invitation for further discussion thereafter, the conversation between him and Shriner, without more, was, as a matter of law, too general to support an inference that Bausch had undertaken to participate in the infant's care and treatment. Absent such an inference, the record fails to support a finding that there existed a physician-patient relationship between the infant and Bausch. That being so, the trial court correctly concluded Bausch was entitled to judgment as a matter of law.

AFFIRMED.

HASTINGS, C.J., not participating.