980 S.W.2d 166 (1998)
Rebecca CORBET and Timothy Corbet, Plaintiffs/Appellants,
v.
John W. McKINNEY, M.D., Defendant/Respondent.
No. 73817.
Missouri Court of Appeals, Eastern District, Division Three.
November 10, 1998.
*167 Douglas P. Dowd, James M. Dowd, Dowd & Dowd, P.C., St. Louis, for appellants.
Bernard C. Brinker, Gary P. Paul, Brinker & Doyen, L.L.P., St. Louis, for respondent.
*168 CRANE, Judge.
Plaintiffs, an emergency room patient and her spouse, filed this medical malpractice action against defendant physician alleging that defendant's failure to diagnose patient caused her to suffer permanent deafness in her right ear. Defendant moved for summary judgment on the grounds that he did not owe patient a duty of care because the telephone conversation in which patient's treating physician described her complaints to defendant and defendant responded that "this was usually a viral illness" did not give rise to a physician-patient relationship between himself and patient. Plaintiffs appeal from the entry of summary judgment in defendant's favor. We affirm.
In his motion for summary judgment, defendant set out the following facts which plaintiffs, Rebecca Corbet (patient) and Timothy Corbet, her spouse, subsequently admitted: On January 8, 1994, patient entered the Missouri Baptist Medical Center (MBMC) emergency room. Patient was seen and treated by the attending emergency room physician, Dr. Samuel Ockner. While patient was in the emergency room, Dr. Ockner telephoned Dr. J. Hubert, patient's regular physician. During their telephone conversation, it was suggested that defendant, an ear, nose and throat specialist, be contacted. Dr. Ockner believed that he presented patient's case to defendant over the telephone by relaying her complaints as set forth on her medical chart. Dr. Ockner did not request defendant to examine patient while she was in the emergency room. Dr. Ockner diagnosed and treated patient for acute labyrinthitis. In his discharge instructions, Dr. Ockner told patient to follow-up with defendant in two days. Defendant did not recall receiving a telephone call from Dr. Ockner about patient. Defendant has never spoken to or examined patient.
In her response to the motion, patient added material from Dr. Ockner's deposition relating to the telephone call. Dr. Ockner testified that he called defendant as a consultant, presented the information from patient's medical chart to him, that defendant mentioned that he had a case or two like it in the previous week and that "this is usually a viral illness." Dr. Ockner calls consultants to obtain a plan of treatment and believes the plan on patient's chart was the plan defendant recommended because Dr. Ockner would not have overridden him. Dr. Ockner testified that he made the diagnosis after talking with defendant and may have used some of defendant's terminology. However, Dr. Ockner further testified that he, not defendant, made the diagnosis.
On a motion for summary judgment, a "defending party" may establish a right to judgment by showing (1) facts that negate any one of the claimant's elements facts, (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements, or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense. ITT Commercial Finance v. Mid-Am. Marine, 854 S.W.2d 371, 381 (Mo. banc 1993). When the movant has made a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law as provided in Rule 74.04, the burden shifts to the non-movant. Id. The adverse party may not rest upon the mere allegations or denials of that party's pleading, but the response, by affidavits or as otherwise provided in Rule 74.04, shall set forth specific facts showing that there is a genuine issue for trial. Rule 74.04(e).
In their response to the motion for summary judgment, plaintiffs relied on testimony that defendant was a "consultant" on the case and argued from that premise that a physician-patient relationship arose. For their sole point on appeal, plaintiffs assert that the trial court erred in granting summary judgment because there remained a genuine issue of material fact on whether a physician-patient relationship existed. They again argue that Dr. Ockner's testimony characterizing defendant as a "consultant" is sufficient to establish this relationship. We hold that, under the undisputed facts of this case, defendant's consultation with Dr. Ockner did not establish the requisite relationship *169 and consequent duty of care as a matter of law.
Medical malpractice was recognized as a legal wrong before the rise of negligence as a separate tort and the development of modern contract principles. 1 LOUISELL AND WILLIAMS, MEDICAL MALPRACTICE, Section 8.01 at 8-3 (1998). Originally, the physician's profession was viewed as a public one and malpractice resulted in a violation of a duty owed to the public, not to an individual. Id. As modern contract concepts developed, courts expanded a physician's duty in terms of contract duty. Id. at 8-4. However, the development of negligence law provided a more useful basis for malpractice liability because it allowed the duty historically owed the public to be applied to the individual patient. Id.
Medical malpractice liability remains distinct from ordinary negligence in several ways, one of which is the circumstances under which the duty of care arises. A physician's liability to a patient is predicated on the existence of a physician-patient relationship. Id. Section 8.03 at 8-16; Braun v. Riel, 40 S.W.2d 621, 622 (Mo.1931); Richardson v. Rohrbaugh, 857 S.W.2d 415, 417-418 (Mo.App.1993); MAI 21.01, Notes on Use 1.
The physician-patient relationship is a consensual one in which the patient, or persons acting on the patient's behalf, knowingly employs the physician and the physician knowingly consents to treat the patient. LOUISELL AND WILLIAMS, supra, Section 8.03[2] at 8-17; PEGALIS & WACHSMAN, AMERICAN LAW OF MEDICAL MALPRACTICE Section 2:3 at 45 (1980); 61 Am.Jur.2d PHYSICIANS SURGEONS AND OTHER HEALERS Section 96 (1972); St. John v. Pope, 901 S.W.2d 420, 423 (Tex. 1995); Reynolds v. Decatur Memorial Hosp., 277 Ill.App.3d 80, 214 Ill.Dec. 44, 660 N.E.2d 235, 239 (1996); Flynn v. Bausch, 238 Neb. 61, 469 N.W.2d 125, 128 (1991).
"Generally, the relationship is limited to physicians seen directly by the patient; the physician-patient relationship typically does not exist between the patient and physicians consulted by the patient's personal physician." LOUISELL AND WILLIAMS, supra, Section 8.03 at 8-198-20. The liability of a physician who is consulted on a case by a patient's treating or family physician generally depends on whether the physician undertakes to examine, diagnose, or treat the patient, or merely undertakes to advise the patient's treating physician as to general patient care. See James L. Rigelhaupt, Jr., Annotation, What Constitutes Physician-Patient Relationship for Malpractice Purposes, 17 A.L.R.4th 132 (1982). Thus, where the question is whether a physician-patient relationship has arisen between another doctor's patient and a physician consulted on the case, we look for these indicia of consent as well as other evidence of a consensual relation.
Niccoli v. Thompson, 713 S.W.2d 579 (Mo. App.1986), illustrates the creation of such a relationship where the physician dealt directly with the patient at the request of another physician and billed for his services. In Niccoli a physician-patient relationship was established where a consulting oncologist, at the request of the patient's surgeon, examined the patient the day before surgery for the purpose of the surgeon's treatment, recommended that the surgeon perform a specific surgical procedure, and charged a fee for his consultation services. Id. at 583-84.
Where the consultant physician does not physically examine or bill the patient, a physician-patient relationship can still arise where the physician is contractually obligated to provide assistance in the patient's diagnosis or treatment and does so. In McKinney v. Schlatter, 118 Ohio App.3d 328, 692 N.E.2d 1045 (1997), the Ohio appellate court held a physician-patient relationship is created by implication between a hospital emergency room patient and the hospital's on-call physician who is consulted by the patient's physician, but who has never met, spoken with, or consulted the patient, when the on-call physician: "(1) participates in the diagnosis of the patient's condition, (2) participates in or prescribes a course of treatment for the patient, and (3) owes a duty to the hospital, staff or patient for whose benefit he is on-call." Id. at 1050. In order for a consulting physician to be liable as an "on-call" physician, the Texas court of appeals has held that the physician must have a contractual obligation with the *170 treating hospital to be "on-call" or the physician must be required to be "on-call" to maintain staff privileges. Fought v. Solce, 821 S.W.2d 218, 220 (Tex.App.1991). A physician's "on call" status, without more, does not give rise to liability. Id.; See also Rivera v. Prince Georges County Health Dept., 102 Md.App. 456, 649 A.2d 1212, 1225 (1994).
In contrast, where the consulted physician merely undertakes to advise the patient's treating physician, has no explicit contractual obligation to the patient, treating physician, or treating hospital to provide care, and does not take actions which indicate knowing consent to treat a patient who has sought that treatment, such as by examining, diagnosing, treating, prescribing treatment for, or charging the patient, no relationship and no duty of care arises. Accordingly, courts which have been asked to determine the existence of a physician-patient relationship in factual situations similar to the one before us have found none.
In Hill by Burston v. Kokosky, 186 Mich. App. 300, 463 N.W.2d 265 (1990), a treating physician telephoned two colleagues to ask their opinion about a patient. Without talking to the patient, examining her, or reviewing her chart, the physicians offered their opinions based on the case history related to them by the treating physician. In a subsequent malpractice action, plaintiffs alleged that the patient was injured as a result of the advice given by the consulted physicians. The Michigan appellate court affirmed summary judgment in the consulted physicians' favor, explaining:
Neither defendant knew, examined, or spoke with plaintiffs. [Patient] was not referred to defendants for treatment or consultation. Plaintiffs did not employ defendants, nor did they seek medical advice or treatment from defendants. Defendants' medical opinions were addressed directly to [the treating physician] as a colleague, and not indirectly to plaintiffs as patients. The opinions were not in the nature of prescribed course of treatment, but were recommendations to be accepted or rejected by [the treating physician] as he saw fit. In short, the telephone conversations between [the treating physician] and defendants did not give rise to a physician-patient relationship between plaintiffs and defendants. Summary disposition was proper.
Id. at 267.
Similarly, in Lopez v. Aziz, 852 S.W.2d 303 (Tex.App.1993), the court refused to extend malpractice liability to a defendant obstetrician who, in a single telephone conversation with the treating physician, recommended that the treating physician perform a laboratory workup on a patient. The treating physician testified that he sought and followed the advice. The Texas appellate court affirmed the entry of summary judgment in defendant's favor on the grounds that there was no duty of care:
In the present case, there is no evidence that [defendant] contracted with [the treating physician], or anyone else, to perform any services for [the patient]. [Defendant] did not accept any work relating to [the patient's] case, did not conduct any laboratory tests or review the results of tests performed by others, did not prepare any reports, and did not bill either [plaintiff] or [her treating physician].... Nothing in the record suggests that either doctor contemplated that [defendant's] comments were binding on [the treating physician] or that [defendant] had any authority or responsibility to control the course of [patient's] treatment. On the contrary, [the treating physician's] testimony shows that he retained responsibility for [patient's] care, he weighed [defendant's] advice, and he made a decision to accept it.
Lopez, 852 S.W.2d at 306-07.
In Flynn v. Bausch, 238 Neb. 61, 469 N.W.2d 125 (1991), the Nebraska Supreme Court affirmed summary judgment in defendant's favor where infant patient's treating physician had a conversation with defendant, a doctor who was treating another infant in the next bed, about the patient's jaundiced condition and the consulted physician, who looked at but did not examine patient, suggested that the treating physician wait to do a transfusion until he received the outcome of some ordered tests. The court held the advice was too general to support the inference *171 that the consulting physician had undertaken to participate in patient's care and treatment.
Likewise, in Reynolds v. Decatur Memorial Hosp., 277 Ill.App.3d 80, 214 Ill.Dec. 44, 660 N.E.2d 235 (1996) the court affirmed summary judgment in defendant's favor where defendant physician consulted by telephone with a colleague who gave him patient's history and examination results and defendant discussed the possibility that patient had meningitis and suggested a spinal tap. He offered to see the patient, but was not requested by the doctor or patient's family to see, examine, treat or diagnose the patient's condition. He did not bill for any services.
In the context of determining minimum contacts, rather than tort liability, the Missouri Supreme Court has held that no physician-patient relationship arose in the following situation. A treating physician wrote a letter to another physician who was an expert on a particular surgical procedure. In the letter he described his patient's condition, forwarded the patient's x-rays, asked the expert if he felt a certain operation was indicated for that patient, and asked how the procedure should be altered for an adult patient. The expert physician replied, agreed with the diagnosis, described the operation, made notations on the x-rays, gave cautionary advice, and mentioned that he had done several of the operations and they had worked out well. He invited further questions. He did not charge a fee. The Missouri Supreme Court found no doctor-patient relationship on these facts, adding
nothing in the record indicates that Dr. Pemberton knew whether his suggested technique would be followed; there was no correspondence between Drs. Michael and Pemberton after the operation. The unsolicited letter of Dr. Michael and the response was akin to a discussion of a clinical problem similar to discussions among other professional groups. Dr. Pemberton did not undertake to treat relator.
State ex rel. Sperandio v. Clymer, 581 S.W.2d 377, 382-83 (Mo.1979).
Here, there is no evidence that defendant contracted to provide medical services to patient with patient, Dr. Ockner, or the hospital. Defendant did not know patient, never spoke with her, and never examined her. Defendant did not diagnose patient. Defendant only offered a recommendation for treatment which was addressed directly to Dr. Ockner as a colleague, and not indirectly to patient. Nothing in the record indicates that defendant knew whether his recommendation would be followed. Dr. Ockner was free to accept or reject defendant's recommendation at his discretion.
As a matter of law, no physician-patient relationship existed between defendant and the patient plaintiff. The judgment of the trial court granting summary judgment is affirmed.
SIMON, P.J., and MOONEY, J., concur.