### A99A0040. SCHRADER v. KOHOUT.
(522 SE2d 19)

SMITH, Judge.

This case arises out of the denial of a motion for summary judgment by Sue Schrader in a medical malpractice action filed against

her by Kim Kohout. For the reasons that follow, we reverse.[1]

Kim Kohout filed her initial complaint against Schrader and several other defendants, alleging that they negligently provided psychological care and treatment to her. In a much expanded amended complaint in which Kohout named several new defendants, she alleged that "Schrader violated the duty which she owed to Plaintiff to exercise the ordinary care and diligence which a reasonable and prudent psychologist supervising a nonmedical therapist would have used in the same or similar circumstances." Schrader filed a motion for summary judgment. She argued, among other things, that she did not have a professional relationship with Kohout, did not perform any professional services for her, and therefore owed Kohout no legal or professional duty. The trial court denied the motion, but granted a certificate of immediate review. This court granted Schrader's application for interlocutory appeal. Because we agree with Schrader that no physician-client relationship existed between her and Kohout, we reverse.

Kohout, who had a history of psychological problems,[2] began treatment with Dr. Donna Ulrici, a psychologist, in 1990. Ulrici diagnosed Kohout as suffering from "Multiple Personality Disorder." A short time later, Ulrici began consulting with Schrader, another psychologist, concerning Kohout's condition because of Schrader's "expertise in dissociative disorders." These consultations began in May 1991, and they ended in December 1995. Schrader met with Ulrici individually during the first four consultations, while the remainder were group consultations that included approximately five other psychotherapists. Ulrici paid a fee to Schrader for the consultations, and it appears that Kohout's condition and treatment options were discussed extensively during the sessions, which occurred bi-monthly and lasted two hours each. We also note that both Schrader and Ulrici referred to the consultations occasionally as "supervision" groups in their notes and that the trial court, in its order denying summary judgment, referred to the group as a " 'supervision consultation group.' "

The extensive nature of the consultations concerning Kohout's condition and the occasional references to the consultation groups as "supervision groups" notwithstanding, we agree with Schrader that summary judgment on her behalf was warranted.

Georgia law is clear that physician-patient privity is an absolute requirement for the maintenance of a professional malpractice action.

---

[1] The facts of this case are more fully set out in *Charter Peachford Behavioral Health System v. Kohout*, 233 Ga. App. 452 (504 SE2d 514) (1998) (physical precedent only).

[2] See id. at 452-453.

> It is a well-settled principle of Georgia law that there can be no liability for malpractice in the absence of [a] physician-patient relationship. . . . In such cases, called classic medical malpractice actions, doctor-patient privity is essential because it is this relation which is a result of a consensual transaction that establishes the legal duty to conform to a standard of conduct. The relationship is considered consensual where the patient knowingly seeks the assistance of the physician and the physician knowingly accepts him as a patient.

(Citations and punctuation omitted.) *Peace v. Weisman*, 186 Ga. App. 697, 698 (1) (368 SE2d 319) (1988). See also *Payne v. Sherrer*, 217 Ga. App. 761, 762-763 (458 SE2d 916) (1995); *Minster v. Pohl*, 206 Ga. App. 617 (426 SE2d 204) (1992).

It is true that Schrader consulted with Ulrici, for compensation, about Kohout's condition for over four years. But these facts did not automatically create a physician-patient relationship between Schrader and Kohout. The record shows that the fee was paid personally by Ulrici, and Kohout has pointed to no evidence showing that she was charged for Schrader's services. More importantly, it is undisputed that Schrader never met Kohout and never saw her records during the consultation period, and Kohout's identity was not disclosed, except for her first name, during this period. Additionally, the undisputed evidence shows that Schrader had no authority with regard to Ulrici's treatment of Kohout. Ulrici testified by affidavit that "[a]t all times, my treatment of plaintiff . . . was conducted independently under the authority of my license as a clinical psychologist. Although I did discuss psychotherapy techniques relating to MPD with Dr. Schrader, I always maintained the independent authority and responsibility in regard to the treatment of my patient." Although the consultation group attended by Ulrici was occasionally referred to as a "supervision" group, and Schrader may have occasionally been referred to as Ulrici's "supervisor," both Ulrici and Schrader have provided direct, undisputed, unequivocal evidence that Schrader never supervised Ulrici's treatment of Kohout.

Under these facts, we cannot conclude that Kohout has shown the essential element of physician-patient privity. Schrader never examined Kohout and never even met with her.[3] Schrader never saw Kohout's medical records during the consultation period. Although

---

[3] We note that in *Peace*, supra, and *Payne*, supra, privity was not established even where plaintiffs were examined by the physicians on whom they sought to impose professional liability. Here, not only did Schrader never examine Kohout, she also never even met or talked with her before this lawsuit was instituted, nor did she review her medical records.

Kohout may have known that Ulrici was consulting with Schrader, the record does not show that the relationship between Schrader and Kohout was one in which the "patient knowingly [sought] the assistance of the physician and the physician knowingly accept[ed] [her] as a patient." (Citation and punctuation omitted.) *Peace*, supra at 698 (1). Moreover, although Ulrici unquestionably consulted with Schrader for an extended period of time, nothing in the record justifies an inference that Schrader ever acted as Kohout's doctor. See *Minster*, supra at 620 (1). Because Schrader was never privy to Kohout's medical records, it follows that Ulrici controlled the flow of information to Schrader about Kohout's condition; she at all times made decisions as to the extent and type of information about Kohout she shared with Schrader. Most importantly, although Kohout's condition may have been extensively discussed by Ulrici and Schrader, Ulrici made all decisions as to Kohout's treatment. A physician-patient relationship did not exist between Schrader and Kohout under these facts. Accordingly, summary judgment in Schrader's favor was warranted.

We note that the dissent cites several cases from other jurisdictions for the proposition that a physician-patient relationship was created in this case. Aside from the fact that these cases are not binding on the courts of this state, several of the cases do not support the dissent's position in this case. For example, the dissent cites a passage from *Corbet v. McKinney*, 980 SW2d 166 (Mo. App. 1998) to support its conclusion that Schrader can be subject to Kohout's malpractice action despite the fact that she never had direct contact with Kohout. In *Corbet*, the Missouri Court of Appeals ultimately held that the secondary physician's consultation with the patient's primary care physician did *not* establish the requisite physician-patient relationship giving rise to a duty of care.

Furthermore, both *McKinney v. Schlatter*, 118 Ohio App.3d 328 (692 NE2d 1045, 1050) (1997) and *Walters v. Rinker*, 520 NE2d 468, 472 (Ind. App. 1988), both cited by the dissent, are factually distinguishable from the case at hand. In *McKinney*, a malpractice claim was allowed against a cardiologist who was officially the "on call" cardiologist for a hospital emergency room at the time that the patient was brought in. Although the cardiologist was not present at the hospital, he was consulted by an attending physician who described the patient's condition. In *McKinney* the malpractice claim was allowed because the cardiologist, as the on-call cardiologist, had accepted primary responsibility and control of cardiac care for emergency room patients.

*Rinker*, supra, can be similarly distinguished from this case. In *Rinker*, a patient was allowed to bring a medical malpractice action against a pathologist for misdiagnosis of a tumor removed from the patient's body. As in *McKinney*, the pathologist in *Rinker* had

accepted direct responsibility and control for one aspect related to the patient's treatment, the analysis of the plaintiff's tumor. The pathologist was the primary physician with regard to the critical determination of the tumor's malignancy.

No acceptance of direct responsibility and control exists in this case. Here, Schrader and several other psychologists joined in a discussion of various cases of the involved psychologists, including Kohout's case. Schrader gave advice on Kohout's treatment to a fellow psychologist. She was under no obligation to the patient to do so, and unlike *McKinney* and *Rinker* never assumed control of the psychological care of Kohout. As such, Schrader cannot be considered to have been in a psychologist-patient relationship, as the dissent contends.

We note that *Bradley Center v. Wessner*, 250 Ga. 199 (296 SE2d 693) (1982), relied upon by the trial court, is inapposite here. The Supreme Court of Georgia in that case addressed the issue of the duty imposed on a mental health hospital to exercise control over a patient who was shown to be likely to cause harm to others. Here, the record shows that Schrader did not "control" Kohout, and the contention has not been made that Schrader was liable for bodily harm caused by Kohout to others.

*Judgment reversed. Johnson, C. J., Blackburn, P. J., Barnes and Ellington, JJ., concur. Pope, P. J., and Eldridge, J., dissent.*

ELDRIDGE, Judge, dissenting.

I respectfully dissent.

In her professional capacity as a psychologist, and for compensation, the defendant rendered professional advice, counsel, evaluation, assistance, and insight into the care, treatment, and evaluation of the plaintiff continuously for over four and one-half years. She knew or should have known that her advice and professional counsel would have an effect on the treatment of the plaintiff. While defendant did not know the identity of the plaintiff, defendant knew that she had an influence and effect through her professional advice upon the treatment of a real person, the plaintiff. Defendant, through the bimonthly consultations for compensation, participated in the treatment of the plaintiff vicariously, through Dr. Ulrici.

Where a professional for compensation provides consultations regarding the care and treatment of a specific individual, a patient-psychologist relationship has been legally created with such individual, so that a malpractice action may be maintained, even though there has been no direct contact or examination of the records, reports, or tests. "Where the consultant physician does not physically examine or bill the patient, a physician-patient relationship can still arise where the physician is contractually obligated to provide assis-

tance in the patient's diagnosis or treatment and does so." (Citation omitted.) *Corbet v. McKinney*, 980 SW2d 166, 169 (Mo. App. 1998).

A physician-patient relationship is created by implication between a patient and an on-call physician, who is consulted by the patient's physician but who has never met or consulted with either the other physician or his patient previously, when the on-call physician "(1) participates in the diagnosis of the patient's condition, (2) participates in or prescribes a course of treatment for the patient, and (3) owes a duty to the hospital, staff, or patient for whose benefit he is on call." *McKinney v. Schlatter*, 118 Ohio App.3d 328 (692 NE2d 1045, 1050) (1997).

When a physician consults at the request of another physician without seeing the patient face to face, as in the case of a pathologist, radiologist, or other specialist, an implied consent results. "The important fact in determining whether the relationship is a consensual one, however, is not who contracted for the service but whether it was contracted for with the express or implied consent of the patient or for his benefit." *Walters v. Rinker*, 520 NE2d 468, 472 (Ind. App. 1988); accord *Bovara v. St. Francis Hosp.*, 298 Ill. App.3d 1025 (700 NE2d 143) (1998); *Dougherty v. Gifford*, 826 SW2d 668, 674-675 (Tex. App. 1992); *Peterson v. St. Cloud Hosp.*, 460 NW2d 635 (Minn. App. 1990); *Phillips v. Good Samaritan Hosp.*, 65 Ohio App.2d 112 (416 NE2d 646) (1979).

A casual consultation, even when it directs a course of treatment, does not give rise to a physician-patient relationship, because the elements of implied physician-patient relationship are absent. *Minster v. Pohl*, 206 Ga. App. 617, 620 (2) (426 SE2d 204) (1992); accord *Oja v. Kin*, 229 Mich. App. 184 (581 NW2d 739) (1998); *Oliver v. Brock*, 342 S2d 1 (Ala. 1977); *Lopez v. Aziz*, 852 SW2d 303, 306 (Tex. App. 1993); *Flynn v. Bausch*, 238 Neb. 61, 67 (469 NW2d 125) (1991); *Hill v. Kokosky*, 186 Mich. App. 300 (463 NW2d 265) (1990); *Sullenger v. Setco Northwest*, 74 Ore. App. 345 (702 P2d 1139) (1985).

It is a well-settled principle of Georgia law that there can be no liability for malpractice in the absence of the health care provider-patient relationship. There are three essential elements imposing liability upon which recovery is bottomed [(and only the first is relevant here)]: (1) The duty inherent in the health care provider-patient relationship. . . . [H]ealth care provider-patient privity is essential because it is this relation which is a result of a consensual transaction that establishes the legal duty to conform to a standard of conduct. The relationship is considered consensual where the patient knowingly seeks the assistance of the health care provider and the health care provider knowingly

accepts him as a patient. . . . *Peace v. Weisman*, 186 Ga. App. 697, 698 (1) (368 SE2d 319) (1988).

(Citations and punctuation omitted.) *South Fulton Med. Center v. Poe*, 224 Ga. App. 107, 109 (480 SE2d 40) (1996); see also *Buttersworth v. Swint*, 53 Ga. App. 602, 603 (2) (186 SE 770) (1936).

[I]t has been held almost uniformly in other jurisdictions that a physician who has been retained by a third party[, who is neither the treating physician nor acting on behalf of the patient,] to undertake a medical examination of an individual cannot be held liable to that individual for malpractice as a result of that examination, *where he neither offered nor intended to treat, care for, or otherwise benefit the individual* and did not injure him during the course of the examination. [Cits.] *A different result is, of course, mandated where the physician did assume the role of treating the patient.* [Cits.]

(Emphasis supplied.) *Peace v. Weisman*, supra at 698-699.

A [psychologist]-patient relationship exists where the patient [or someone on her behalf] knowingly seeks the assistance of the [psychologist] and the [psychologist] knowingly accepts [her] as a patient. We have held in medical malpractice actions, and it is generally the law of other jurisdictions, that when an employer retains a physician to examine an employee, no physician-patient relationship exists between the employee and the physician. This is because in such a situation, the physician has neither offered nor intended to treat, care for, *or otherwise benefit the individual.*

(Citations and punctuation omitted; emphasis supplied.) *Payne v. Sherrer*, 217 Ga. App. 761, 762-763 (1) (458 SE2d 916) (1995). Consultation for a fee with the treating professional, regarding the diagnosis, care, and treatment of a subject individual, creates a professional-client relationship with such subject individual.

Under the facts and circumstances of this case, defendant knowingly, intentionally, and willingly entered into and undertook to provide consultations for Kohout for compensation, waiving any right to know her identity, to examine either Kohout or her records, or to be more directly involved in her treatment for over four and one-half years. This is not a case of a quick, free, casual consultation between colleagues, but a long-term professional relationship for a fee regarding the care and treatment of the plaintiff. See generally *Minster v.*

*Pohl,* supra at 620-621 (2). Although "there is no rule of law that requires a physician to undertake the treatment of every patient who applies to him," when, as in this case, a defendant undertakes for compensation to consult on the care of a patient for four and one-half years, such undisputed facts and circumstances create a professional relationship and duty of care. *Buttersworth v. Swint,* supra at 604; accord *Clanton v. Von Haam,* 177 Ga. App. 694, 696-697 (2) (340 SE2d 627) (1986). Thus, defendant "knowingly accept[ed] [Kim] as a [consultation] patient," even though she did not intend to create a legal relationship as psychologist-patient; by undertaking intentionally to act as a consultant in the care and treatment of the plaintiff, the defendant created the legal relationship of psychologist-patient. See generally *South Fulton Med. Center v. Poe,* supra at 109.

While the plaintiff was not aware that the defendant was consulting with Dr. Ulrici, plaintiff, through her patient-psychologist relationship with Dr. Ulrici, had authorized and empowered Dr. Ulrici to associate or consult with anyone during her treatment that Dr. Ulrici deemed appropriate for plaintiff's care and treatment. Thus, Dr. Ulrici had the power and authority to create and accept on plaintiff's behalf the patient-psychologist relationship with the defendant, which she did. The four and one-half years of compensated consultation with defendant had one single purpose, the care and treatment of plaintiff. Whether viewed as a third-party beneficiary to the agreement between the professionals or a contract by an agent, Dr. Ulrici, on behalf of a principal (plaintiff), expended considerable time and money with the defendant so that the defendant could have an effect on the plaintiff's treatment, and defendant intentionally continued in such arrangement. *South Fulton Med. Center v. Poe,* supra at 109-110. This is not a case where the plaintiff rejected the care and treatment of the defendant, but in fact accepted it, albeit vicariously, through Dr. Ulrici. See *Clough v. Lively,* 193 Ga. App. 286, 288 (387 SE2d 573) (1989). The trial court did not err in denying the motion for summary judgment.

As a matter of public policy, a professional should not be permitted to profit monetarily and experientially from professional consultation regarding the care and treatment of a patient, and still escape the duty to exercise ordinary care as a professional for such patient. Otherwise, a professional could indirectly through consultations use humans as guinea pigs upon whom to experiment without incurring liability.[4]

---

[4] Where a physician or other health care professional undertakes to train and supervise, as faculty, staff, or contract provider, other members of their profession as part of an ongoing training program involving the care and treatment of patients, "in the increasingly complex modern delivery of health care, a physician who undertakes to provide . . . supervi-

I am authorized to state that Presiding Judge Pope joins in this dissent.

DECIDED JULY 15, 1999

*Smith, Gambrell & Russell, Rex M. Lamb III, Edward D. Burch, Jr.*, for appellant.

*Goetz, Tibbs & Zahler, Charles M. Goetz, Jr., Philippa V. Tibbs, Scott M. Zahler*, for appellee.

*Rogers & Hardin, Robert B. Remar*, amicus curiae.

---

sion of residents [or other professionals in training] actually treating a patient may be held accountable to that patient, if the physician negligently supervises those residents [or other professionals in training] and such negligent supervision proximately causes the patient's injuries," then the supervising physician or health care professional is liable to the patient, notwithstanding the absence of a physician-patient relationship. (Citations omitted.) *Mozingo v. Pitt County Mem. Hosp.*, 331 N. C. 182 (415 SE2d 341, 345) (1992); see also *Jackson v. Oklahoma Mem. Hosp.*, 909 P2d 765 (Okla. 1996); *Brooks v. Goldhammer*, 608 S2d 394 (Ala. 1992). The supervising physician or health care professional owes to the patient a duty of ordinary care in the supervising of the training of others. *Rouse v. Pitt County Mem. Hosp.*, 343 N. C. 186 (470 SE2d 44, 47) (1996).

Under the facts of this case, the defendant denies that she undertook to supervise Dr. Ulrici or others. However, the existing evidence raises a strong inference that the defendant may have, in fact, been supervising Dr. Ulrici. Further, discovery and evidence could establish whether or not which was the case or show that there exists a clear disputed material issue of fact in such regard.