## 70991. CLANTON et al. v. VON HAAM.
(340 SE2d 627)

CARLEY, Judge.

Plaintiff-appellants Mr. and Mrs. Clanton filed a multi-count medical malpractice suit against numerous defendants, including appellee Dr. Von Haam. Insofar as they have relevancy to the instant appeal, the facts which underlay appellants' suit are as follows:

Mrs. Clanton went to a hospital emergency room complaining of pain in her back. While there, she developed numbness in her legs and experienced difficulty walking. She was examined by a doctor who was on duty in the emergency room and who then released her with a prescription for pain medicine. When she returned home, the pain worsened and the numbness increased. Mrs. Clanton telephoned the emergency room and was told that the doctor who had seen her had gone home. Mrs. Clanton then called the answering service of appellee and his partner, both of whom had previously treated her for a totally unrelated condition. Appellee returned her call within a few minutes and listened to a recital of her symptoms. However, according to the allegations of the complaint, appellee "refused to make a house call and refused to agree to meet Mrs. Clanton at the hospital, but rather told her that it was too late in the evening and she would have to wait to see him in the morning." After the telephone conversation with appellee, Mrs. Clanton's condition continued to deteriorate. Several hours later, she was admitted to the hospital for treatment by another physician. She is now paralyzed. Appellants' complaint alleged that appellee "knew or should have known that Mrs. Clanton's condition was critical and in the absence of action would result in paraplegia. As a direct and proximate result of [appellee's] negligent failure to recognize the need for immediate treatment and of his negligent failure to advise Mrs. Clanton to return to the hospital for immediate additional care, Mrs. Clanton has sustained painful personal injuries and is now a paraplegic."

Appellee moved for summary judgment and supported the motion by his own affidavit. In that affidavit, he stated that, insofar as Mrs. Clanton's current physical condition is concerned, no physician-

patient relationship contemplating treatment thereof had existed prior to or was created by the phone call. According to appellee's affidavit, in that conversation he had "recommended that [Mrs.] Clanton take the medication prescribed for her by another physician earlier that evening [in the emergency room] and contact him later the same morning at [appellee's] office." However, Mrs. Clanton's own version of appellee's conversation was significantly different. According to her deposition, appellee "just said, you know, there wasn't nothing he could do for me." Mrs. Clanton also testified that appellee had not asked her "to come see him in the morning or [said] that he would see [her] in the morning or anything like that." In further response to appellee's motion for summary judgment, appellants submitted a physician's affidavit stating that a physician-patient relationship had been established in the telephone conversation and that appellee had failed to exercise due care in treating Mrs. Clanton. Appellants also submitted the deposition of another physician which was to the same effect.

The trial court granted appellee's motion. Appellants appeal, contending that it was error to grant summary judgment as there remained two genuine issues of material fact. The two issues that appellants perceive to remain for jury resolution are whether a physician-patient relationship existed between appellee and Mrs. Clanton and whether appellee was negligent in treating her. Appellee's focus is on the first issue. According to appellee, notwithstanding the conclusions expressed by the various medical experts as to this issue, no such physician-patient relationship existed, as a matter of law, under the facts of the case. On this basis, appellee contends that summary judgment was properly granted in his favor.

1. "The opinions of experts on any question of science, skill, trade, or like questions shall always be admissible. . . ." OCGA § 24-9-67. "[T]he correct rule is as follows: Expert opinion testimony on issues to be decided by the jury, even the ultimate issue, is admissible where the conclusion of the expert is one which jurors would not ordinarily be able to draw for themselves; i.e., the conclusion is beyond the ken of the average layman. [Cits.]" *Smith v. State*, 247 Ga. 612, 619 (277 SE2d 678) (1981). Thus, "[e]xcept in extreme circumstances," the issue of whether the defendant-physician in a medical malpractice action has complied with applicable standards of professional conduct "must be presented through expert testimony. [Cits.]" *Fountain v. Cobb Gen. Hosp.*, 167 Ga. App. 36, 37 (306 SE2d 37) (1983). However, it is equally clear that the scope of what is admissible as expert opinion testimony is not unlimited. It is the established rule "[i]n Georgia, [that] where (a) the path from evidence to conclusion is not 'shrouded in the mystery of professional skill or knowledge,' and (b) the conclusion determines the ultimate issues of fact in

a case, the jury must make the journey from evidence to conclusion without the aid of expert testimony. [Cits.] A party may not bolster his opinion as to the ultimate issue with expert testimony when the jury could reach the same conclusion 'independently of the opinion of others.' [Cit.]" *Williams v. State*, 254 Ga. 508, 510 (330 SE2d 353) (1985).

With regard to the issue of a physician-patient relationship in the instant case, the affidavit of appellee and the affidavit and deposition of appellants' experts all contain statements which merely express an ultimate conclusion to the effect that such a relationship either did or did not exist. In no instance is there a showing of any objective standard which was relied upon and applied in reaching those differing conclusions. It does not appear, however, that any particular professional skill or specialized medical knowledge would necessarily be required to penetrate a "shroud of mystery" surrounding that issue. The established test in Georgia for determining the initial creation of a physician-patient relationship is well within the comprehension of the average layman, in that it more nearly involves the application of non-expert concepts of a contractual nature rather than any expert medical principles. The physician-patient relationship " 'is a consensual one wherein the patient knowingly seeks the assistance of the physician and the physician knowingly accepts him as a patient.' [Cit.]" *Buttersworth v. Swint*, 53 Ga. App. 602, 603-604 (2) (186 SE 770) (1936). Accordingly, as to this issue, the differing ultimate conclusions of the physicians in the instant case evince no more than a difference of non-medical opinion between witnesses who happen to be physicians. Those conclusions are neither admissible nor probative as expert medical testimony. See generally *Williams v. State*, supra at 510 (2).

2. The issue remains, however, whether disregarding the opinion testimony, a jury would be authorized to find that the requisite relationship existed in the instant case. "[B]efore a plaintiff may recover on the theory that he received negligent treatment from a defendant physician, the plaintiff must show that a doctor-patient relationship existed between them. In such cases, called 'classic medical malpractice actions' . . . , doctor-patient privity is essential because it is this 'relation . . . which is a result of a consensual transaction' that establishes the legal duty to conform to a standard of conduct. [Cit.]" *Bradley Center v. Wessner*, 250 Ga. 199, 201 (296 SE2d 693) (1982). The evidence is that, notwithstanding the late hour, appellee, who had treated Mrs. Clanton previously but for a totally unrelated condition, elected to return her telephone call. He then listened to a full recital of her symptoms. However, this alone does not create a patient-physician relationship. "Merely that the defendant was a physician and knew of the condition of the plaintiff would not devolve

upon him the duty of rendering to her medical care, even though he was applied to for services by the plaintiff herself and through others; for there is no rule of law that requires a physician to undertake the treatment of every patient who applies to him. . . . '[O]ne who has secured a [medical] license according to statute is not liable for damages alleged to result from the refusal to take a case.' [Cits.]" *Buttersworth v. Swint*, supra at 604.

The crucial issue is whether the evidence regarding the telephone conversation would authorize a finding of a "consensual transaction" whereby Mrs. Clanton became appellee's patient for treatment of her then existing condition. Appellee testified that, in his late night conversation, he "recommended" that Mrs. Clanton continue the immediate course of treatment prescribed by another physician and that she should call him back in the morning. An individual, hearing only such a recommendation in response to a late night solicitation for medical assistance might well assume that he or she had been accepted as a patient by the physician rendering it and, to his or her ultimate detriment, follow that advice and suspend further efforts to secure medical treatment from another source. However, it is undisputed that that did not happen in the instant case. Notwithstanding what appellee states he may have "recommended" to Mrs. Clanton, she herself interpreted the conversation as a total refusal of her efforts to secure appellee's medical services. It is undisputed that she never considered that, as the result of the telephone call, appellee had undertaken to render his medical expertise available to her then or at any time in the future. There is no dispute that Mrs. Clanton never relied upon any medical advice whatsoever from appellee and that she was in no way dissuaded from seeking medical attention elsewhere as the result of the conversation. She ultimately seeks to recover, not on the basis that appellee actually afforded her negligent treatment which she then followed to her injury, but solely on the basis that appellee refused to initiate non-negligent treatment by which she might have avoided injury. The evidence thus shows without contradiction that there was never a "consensual transaction" between appellee as treating physician and Mrs. Clanton as patient regarding her current physical condition. The evidence showing that no relationship was created which gave rise to any professional duty, the breach of which duty proximately caused Mrs. Clanton's existing condition, the trial court did not err in granting summary judgment. See generally *Buttersworth v. Swint*, supra; *Meeks v. Coan*, 165 Ga. App. 731, 733 (2) (302 SE2d 418) (1983); *Hansell, Post, Brandon & Dorsey v. Fowler*, 160 Ga. App. 732 (288 SE2d 277) (1981).

*Judgment affirmed. Birdsong, P. J., and Sognier, J., concur.*

698

Decided January 24, 1986 —
Rehearing denied February 7, 1986 — 

*James A. Eichelberger, Gwendolyn R. Tyre*, for appellants.
*Lawrie E. Demorest, Mark F. Dehler, Allen S. Willingham, Y. Kevin Williams*, for appellee.