A96A1181. SOUTH FULTON MEDICAL CENTER, INC. v. POE et al.
(480 SE2d 40)

POPE, Presiding Judge.

Ernest and Jacqueline Poe, parents of the deceased infant Ernest Poe, Jr., brought this medical malpractice action against South Fulton Medical Center and Dr. M. O. Tomeh for their son's death. The matter was tried to a jury, which returned a verdict in favor of Tomeh, and against South Fulton for 1.85 million dollars. South Fulton appeals and, for the following reasons, we affirm.

Evidence at trial was that Ernest Poe, Jr. was born at South Fulton on April 29, 1991. The infant was kept at the hospital until May 6, 1991, where he was treated in the intensive care unit by his pediatrician, Dr. Tomeh, for hypoglycemia, jaundice and possible sepsis. The baby was discharged and the Poes were given specific instructions to call a physician if the baby's temperature was greater than 100 degrees; if there was a change in the baby's color; or if there was a change in the baby's eating habits.

The day after Ernest Jr.'s discharge, the Poes brought him to the South Fulton emergency room, where they were attended to by the triage nurse on duty, Merry Gunnin. The Poes complained that the baby had turned blue at home. They also reported that the baby had not had a bowel movement all day, appeared limp and that his eyes had rolled back in his head.

Gunnin assessed the baby at 10:45 p.m.; she took his pulse, and checked his respiration and temperature. The infant's vital signs were not completely normal, but they were not alarming. The baby had a low grade fever and slept through the examination. While the Poes were at the hospital, the baby had a bowel movement.

According to both Gunnin and the Poes, the exchange between the adults during the baby's assessment was tense. Gunnin testified that she instructed the Poes to fill out certain forms and that Mr. Poe, who appeared agitated, kept "screaming" and demanding that his baby see a doctor immediately. Gunnin admitted that she also raised her voice. Mr. Poe testified that he and Gunnin were "barking like dogs" at each other. The Poes both testified that Gunnin had a "nasty attitude" and would not listen to Mrs. Poe's complaints.

After completing the examination of the baby, Gunnin admitted that she told the Poes that "the baby was fine right now." Gunnin stated that she told the Poes that "the baby was doing okay" a couple

of times in an effort to calm them. She also told them that the baby was breathing properly at that time. According to Mrs. Poe, Gunnin told her that she was overreacting. Gunnin then classified the baby according to South Fulton's internal procedure as "Priority 3" — which denoted that semi-urgent medical intervention would be required within approximately eight hours, but that the problem was not immediately life threatening or severe.

Gunnin instructed the Poes to sit in the waiting room and told them a doctor would be with their baby shortly. The Poes, who felt they had been overreacting to the baby's problems and believed that the infant would be alright until the next morning when he could see a doctor, left the emergency room within eight minutes after the examination. The admissions clerk recalled that Mr. Poe did not complete the documents he was filling out — specifically, he did not sign the "consent to treatment" form. Although Gunnin was unaware that the Poes were leaving, the emergency room admissions clerk told Mr. Poe that the decision to leave was his. The baby died several hours after the Poes left South Fulton.

The Poes filed this medical malpractice action, based in part, upon South Fulton's: failure to accurately diagnose and triage the infant; failure to insist that the family remain until seen by a physician; failure to admit the infant for adequate assessment; and failure to have the baby immediately seen by a physician. Experts testified at trial that Gunnin's actions fell below the applicable standard of care in several ways — particularly in her failure to take the baby to a physician immediately and in her failure to classify the baby's condition as life threatening.

1. South Fulton contends that, as a matter of law, the infant was not its patient and that the trial court erred in denying its motions for summary judgment, directed verdict and j.n.o.v. We first note that to the extent that South Fulton argues that its motion for summary judgment was improperly denied, the issue is moot. See *Dept. of Transp. v. Brown*, 218 Ga. App. 178, 179 (1) (460 SE2d 812) (1995). Therefore we review the denial of the directed verdict motion and the denial of the motion for j.n.o.v. "The standard for granting a directed verdict or a judgment notwithstanding the verdict are the same. Where there is no conflict in the evidence as to any material issue, and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict, such verdict shall be directed." (Citations and punctuation omitted.) *Truck Parts & Svc. v. Rutledge*, 211 Ga. App. 166 (2) (438 SE2d 404) (1993).

Citing *Clough v. Lively*, 193 Ga. App. 286 (387 SE2d 573) (1989), and *Matthews v. DeKalb County Hosp. Auth.*, 211 Ga. App. 858 (440 SE2d 743) (1994), South Fulton argues that a mere assessment of a person's condition does not create a patient-health care provider rela-

tionship, and that the relationship between the Poes and South Fulton was not the requisite consensual one. "It is a well-settled principle of Georgia law that there can be no liability for malpractice in the absence of [the health care provider]-patient relationship. There are three essential elements imposing liability upon which recovery is bottomed: (1) The duty inherent in the [health care provider]-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained. [Cit.] See also OCGA § 51-1-27. In such cases, . . . [health care provider]-patient privity is essential because it is this relation which is a result of a consensual transaction that establishes the legal duty to conform to a standard of conduct. [Cits.] The relationship is considered consensual where the patient knowingly seeks the assistance of the [health care provider] and the [health care provider] knowingly accepts him as a patient." (Citations and punctuation omitted.) *Peace v. Weisman*, 186 Ga. App. 697, 698 (1) (368 SE2d 319) (1988).

In *Matthews v. DeKalb County Hosp. Auth.*, 211 Ga. App. 858, Mrs. Matthews came to the DeKalb General emergency room complaining of a pain in her chest. The triage nurse recorded her history, obtained her vital signs and made an assessment. Matthews indicated that she was not in pain, and the triage nurse classified her condition as non-life threatening and told her that it would be a long wait. After four and a half hours of waiting, a social services representative told Matthews that the doctor would see her next. Matthews stated that she had waited too long and was leaving. The social services representative pleaded with Matthews to stay, but she left nonetheless, and died two days later. This court affirmed the superior court's grant of DeKalb General's motion for summary judgment, finding that Matthews' voluntary termination of her relationship with the hospital severed any causal relationship with DeKalb General's actions.

In *Clough v. Lively*, 193 Ga. App. 286, a police officer responded to an accident call and found Lively semiconscious in an automobile that had left the road. Believing that Lively was intoxicated and not seriously injured, the officer took him to Shallowford Hospital so that a blood sample could be taken. Nurse Clough at Shallowford took a blood sample, checked Lively's vital signs, learned that he might have taken medication, and made a diagnosis of his condition. Clough was not asked to make, nor did she undertake to perform, any examination or render any medical treatment to Lively. In fact, when Clough asked Lively if he either needed or desired medical treatment, he stated that he did not. Clough stated that her involvement on behalf of Shallowford Hospital was solely to comply with the officer's written request that a blood sample be taken from Lively.

Lively was released to the officer, who took him to jail for processing. Shortly after arriving at jail, Lively lapsed into a coma and died. In reversing the superior court's denial of defendants' motion for summary judgment, this Court found that there was a limited relationship created, because neither the nurse and hospital, nor Lively consented to a patient-health care provider relationship. See also *Payne v. Sherrer*, 217 Ga. App. 761 (458 SE2d 916) (1995); *Rogers v. Coronet Ins. Co.*, 206 Ga. App. 46, 49 (3) (424 SE2d 338) (1992); *Minster v. Pohl*, 206 Ga. App. 617 (426 SE2d 204) (1992); *Peace v. Weisman*, 186 Ga. App. 697 (1); *Brumbalow v. Fritz*, 183 Ga. App. 231 (1) (358 SE2d 872) (1987); *Clanton v. Von Haam*, 177 Ga. App. 694 (340 SE2d 627) (1986).

In this case, we find that the requisite consensual relationship was established between South Fulton and the Poes, and that the denials of the motions for directed verdict and j.n.o.v. were proper. Unlike *Clough*, *Clanton*, and the cases cited above, the Poes did not limit the relationship with South Fulton in any manner — they desired and sought out any medical assistance they needed for their baby. There was evidence that the Poes received reassurances that their baby was fine, and on the strength of these reassurances, left the hospital. Regardless of Gunnin's good intentions in reassuring the Poes, there was evidence from which a jury could conclude that these reassurances motivated the Poes to leave the hospital. Compare *Strickland v. DeKalb Hosp. Auth.*, 197 Ga. App. 63, 66 (2) (d) (397 SE2d 576) (1990).

Moreover, although the dissent finds *Matthews v. DeKalb County Hosp. Auth.*, 211 Ga. App. 858, indistinguishable from the instant matter, several important factors differentiate the cases. First, in *Matthews*, there was no evidence of medical error at the time of Matthews' medical examination. In contrast, here there was evidence that Gunnin's actions fell below the standard of care because she failed to take the baby to a physician immediately and failed to classify the baby's condition as life threatening. In fact, Gunnin classified the baby as a "Priority 3," denoting that medical care would be required within eight hours, and the baby actually died during that time. Secondly, in *Matthews*, the medical personnel pleaded with Mrs. Matthews to stay at the hospital. In this case, the Poes initially considered the baby's condition life threatening, but were persuaded otherwise by Gunnin. Moreover, here the patient was a totally dependent infant who necessarily relied on others to discover his condition, unlike the adult patient in *Matthews*, who could describe her own symptoms and respond to questions.

2. In related enumerations of error, South Fulton claims that by taking the infant from the emergency room before he could be examined by a physician, the Poes severed any causal relationship

between the nurse's triage assessment and the infant's death. South Fulton also argues that the Poes failed to exercise ordinary care to avoid the consequences of the hospital's actions. For the reasons outlined above, we also find these arguments without merit.

3. South Fulton argues that the trial court erred by failing to declare a mistrial or take other curative steps during closing argument when the Poes "enlarged and commented" on an exhibit which had not been admitted into evidence. The exhibit at issue was South Fulton's internal performance evaluation on Gunnin, which stated that she needed to "use assertive techniques when in charge rather than confronting staff members."

During the trial there was testimony, to which South Fulton did not object, regarding the contents of the evaluation form. Later, the court ruled that the evaluation itself was inadmissible because it contained hearsay statements. After this ruling, Gunnin was questioned without objection regarding the evaluation's assessment that she "had room for improvement in interpersonal confrontations." Although it is unclear from the record whether, or how, the Poes' counsel referred to this exhibit during closing argument, South Fulton moved for a mistrial. The court denied South Fulton's motion, but cautioned the Poes' counsel not to refer to Gunnin's "problems with people." Poes' counsel resumed closing argument and did not refer to the evaluation again. We find no error in the court's handling of this matter. Even assuming that a reference to the exhibit was made, we find no manifest abuse of the court's broad discretion in denying the motion for mistrial, see *Walker v. Bishop*, 169 Ga. App. 236 (8) (312 SE2d 349) (1983), nor do we find that other curative actions were required. Compare *Williams v. Piggly Wiggly Southern*, 209 Ga. App. 490 (433 SE2d 676) (1993).

4. Citing *Dept. of Transp. v. Benton*, 214 Ga. App. 221, 223 (2) (447 SE2d 159) (1994), South Fulton argues that it is entitled to a new trial because during closing argument the Poes' counsel read portions of witness testimony contained in deposition and trial transcripts, thus violating the rule against "continuing witness" testimony. We find these arguments without merit. The complained of testimony did not go out with the jury during their deliberations and the "continuing witness" theory is inapplicable. See generally *Buckner v. State*, 219 Ga. App. 71, 73 (5) (464 SE2d 11) (1995).

5. South Fulton failed to object to the court's failure to disclose the contents of notes from the jury and waived this argument. See generally *Provost v. Gwinnett County*, 199 Ga. App. 713 (4) (405 SE2d 754) (1991).

6. Finally, South Fulton argues that the trial court improperly charged the jury that the Poes could recover damages based on their own losses rather than on the value of their son's life. Specifically,

South Fulton argues that the charge impermissibly allowed the Poes to recover for their loss of the child's services.

OCGA § 19-7-1 (c) (1) provides that parents of a deceased child shall be entitled to recover the full value of the life of the child. See OCGA § 51-4-4. OCGA § 51-4-1 (1) states that the " '[f]ull value of the life of the decedent, as shown by the evidence' means the full value of the life of the decedent without deducting for any of the necessary or personal expenses of the decedent had he lived."

OCGA § 19-7-1 (a) specifically provides that until the age of majority, the child shall be under the control of the parents, "who are entitled to his services and the proceeds of his labor." It is established that loss of services may be awarded in a wrongful death action as part of the full value of the deceased's life. *Consolidated Freightways &c. v. Futrell*, 201 Ga. App. 233 (1) (410 SE2d 751) (1991). Moreover, the full value of the life of the decedent includes both the economic value of the deceased's normal life expectancy and the intangible element incapable of exact proof, such as "a parent's society, advice, example and counsel." (Citations and punctuation omitted.) *Consolidated Freightways*, 201 Ga. App. at 233 (1); *Miller v. Jenkins*, 201 Ga. App. 825 (1) (412 SE2d 555) (1991). Here, contrary to South Fulton's contentions, the court did not charge the jury as to the Poes' losses, but properly charged the jury regarding the full value of the infant's life.

*Judgment affirmed. Beasley, C. J., McMurray, P. J., Johnson and Blackburn, JJ., concur. Birdsong, P. J., Andrews, Smith and Ruffin, JJ., dissent.*

ANDREWS, Judge, dissenting.

Because I believe *Matthews v. DeKalb County Hosp. Auth.*, 211 Ga. App. 166 (438 SE2d 404) (1993) is indistinguishable from the Poes' situation, I respectfully dissent. I do not believe that the patient-health care provider relationship had been established and, even if the required consensual relationship is assumed, the failure, if any, to comply with the requisite standard regarding assessment of the baby was not the proximate cause of baby Poe's death.

In addition to the facts contained in the majority opinion, viewing the record under the standard for consideration of a motion for j.n.o.v., the following evidence also was adduced. Dr. Tilelli, one of the Poes' expert witnesses, stated that the baby was not in shock when the triage was performed. In his experience, with the baby's symptoms, a "septic workup would have to be done as part of routine care of the baby" once treatment began. He stated that, for Gunnin to tell the Poes that the "baby is okay now" was "an appropriate remark" because one aspect of triage nursing is to be reassuring and to calm people down. He also stated that "[i]f they had stayed, they would

[have seen] a doctor."

Also, Dr. Cullen, another of the Poes' experts, opined that, had the baby been seen 15 to 30 minutes after arriving at the hospital, which would have occurred if the Poes had not left, that would have been appropriate treatment.

Both Mr. and Mrs. Poe stated that Gunnin kept assuring them that the baby was all right. However, as Dr. Cullen stated, that was appropriate for Gunnin to do. Mrs. Poe acknowledged that she was given the clip board with forms to complete and that she knew that Gunnin did not mean that she was to leave without seeing a doctor. "I know that she did not mean that, but she . . . I was convinced that . . . maybe I was overreacting." Mrs. Poe knew that, had they remained, they would have seen a doctor. Similarly, Mr. Poe acknowledged that Gunnin gave them the forms to fill out, that they waited in the waiting room for a while, and that, despite Gunnin's attitude toward him, they would have seen a doctor had they remained. He and Mrs. Poe discussed leaving because they thought, based on what Gunnin had said, they were overreacting. They left without telling anyone they were leaving. It is not disputed that the consent to treat form was never signed.

1. In *Matthews*, supra, Mrs. Matthews went to the emergency room at 11:25 p.m., complaining of pain in her chest radiating down her arm. While her vital signs, like baby Poe's, were slightly elevated, she was not in pain at that time. She was classified as a category 2 non-life threatening condition and told it would be a long wait. After a four and a half hour wait, Mrs. Matthews was told she would be seen next, but because she felt she had not been seen quickly enough, she left. Similarly, here, the Poes, although about to be seen by a doctor, chose to leave the facility without signing the consent form or advising anyone that they were leaving without treatment. In such a situation, the patient-health care provider relationship was not established, as a matter of law. Id.; *Minster v. Pohl*, 206 Ga. App. 617 (426 SE2d 204) (1992); *Clough v. Lively*, 193 Ga. App. 286 (387 SE2d 573) (1989); compare *Brandvain v. Ridgeview Institute*, 188 Ga. App. 106, 112 (2) (372 SE2d 265) (1988), aff'd 259 Ga. 376 (382 SE2d 597) (1989).

This conclusion is also supported by the counterbalancing legal principle that a person is allowed the choice of foregoing needed medical care, and giving treatment without the required consent could have resulted in a claim of battery. OCGA § 31-9-6; *In re L. H. R.*, 253 Ga. 439, 446 (321 SE2d 716) (1984); see *Smith v. Wilfong*, 218 Ga. App. 503, 507 (2) (462 SE2d 163) (1995).

2. Even assuming that such a relationship was established, however, the improper classification of baby Poe was not the proximate cause of his death, nor was the reassurance given by Gunnin, which

plaintiffs' own experts acknowledge was appropriate.

OCGA § 51-12-9 provides that "[d]amages which are the legal and natural result of the act done, though contingent to some extent, are not too remote to be recovered. However, damages traceable to the act, but which are not its legal and natural consequence, are too remote and contingent to be recovered."

"To recover damages in a tort action, a plaintiff must prove that the defendant's negligence was both the 'cause in fact' and the 'proximate cause' of the injury. The requirement of proximate cause constitutes a limit on legal liability; it is a 'policy decision . . . that, for a variety of reasons, e.g., intervening act, the defendant's act and the plaintiff's injury are too remote for the law to countenance recovery.' McAuley [v. Wills, 251 Ga. 3, 7 (303 SE2d 258) (1983)]." Atlanta Ob. & Gyn. Group v. Coleman, 260 Ga. 569 (398 SE2d 16) (1990).

The decision of the Poes based on their conclusion that they were "overreacting" was an intervening act not reasonably foreseeable at the time it occurred. The Poes, when last seen by Gunnin, were in the process of completing the necessary paperwork for treatment of their child. I find it impossible to conclude that it was foreseeable to the hospital personnel that the parents would walk out of the emergency room without notifying anyone of their intentions to do so, particularly in light of the intensity with which they had insisted on immediate treatment. Therefore, I do not believe that, even assuming a provider-patient relationship, the Poes were entitled to recover because the alleged breach of the duty owed, i.e., the misclassification of the baby's condition, while perhaps a "cause in fact," cannot be said to have been the proximate cause of the baby's tragic death. E.g., Wright v. Ashe, 220 Ga. App. 91, 94 (469 SE2d 268) (1996); Wanless v. Winner's Corp., 177 Ga. App. 783, 785 (3) (341 SE2d 250) (1986).

I am authorized to state that Presiding Judge Birdsong, Judge Smith and Judge Ruffin join in this dissent.

DECIDED NOVEMBER 21, 1996 —
RECONSIDERATION DENIED DECEMBER 19, 1996

Sullivan, Hall, Booth & Smith, Terrance C. Sullivan, Rush S. Smith, Jr., Phillip E. Friduss, Dan S. McDevitt, for appellant.

Thomas, Kennedy, Sampson & Patterson, Thomas G. Sampson, La'Sean M. Zilton, Love & Willingham, Traci G. Courville, H & M Johnson, E. Duane Jones, for appellees.