David K. CROCKETT, Individually and as Personal Representative of the Estate of Michael Taylor Crockett, Plaintiff,

v.

NORFOLK SOUTHERN RAILWAY COMPANY, Defendant.

No. CivA 1:98–CV–979–CAM.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 20, 2000.

Ben W. Studdard, III, Joseph Mark Brittain, Smith Welch & Brittain, Stockbridge, GA, Frederick Newman Sager, Jr., Stephen Roberts Chance, Weinberg Wheeler Hudgins Gunn & Dial, Atlanta, GA, Arnold E. Gardner, Office of Arnold E. Gardner, Atlanta, GA, for David K. Crockett, plaintiff.

William C. Thompson, Laura S. Morris, Weissman Nowack Curry & Wilco, Atlanta, GA, for Norfolk Southern Railway Company, defendant.

## ORDER

MOYE, District Judge.

Plaintiff, David K. Crockett, filed this case in the Superior Court of Henry County, Georgia, seeking to recover from Defendant, Norfolk Southern Railway Company (Norfolk Southern), for the allegedly wrongful death of Plaintiff's son, Michael Taylor Crockett (Crockett). Defendant removed the case to this Court based on diversity jurisdiction. The case is before the Court on Plaintiff's motion to amend the complaint, on Defendant's motion for summary judgment or, in the alternative, for partial summary judgment, and on Plaintiff's request for oral argument. For the reasons stated herein, the request for oral argument is denied; the motion to amend is denied; the motion for summary judgment is granted; and the motion for partial summary judgment is denied.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 27, 1996, at approximately 1:30 P.M., Crockett was driving in a westerly direction on Ivey Edwards Road in Henry County, Georgia, approaching a railroad crossing. Crockett had driven along Ivey Edwards Road and crossed the Ivey Edwards Road crossing (the Crossing) on many previous occasions and was familiar with the Crossing. At the same time Crockett approached the Crossing on the road from the east, a Norfolk Southern train approached on the railroad tracks from the north, heading south from Atlanta to Macon.

The train collided with the vehicle driven by Crockett. Crockett sustained a head injury and died on November 30, 1996, as a result of that injury. Crockett was unconscious at the scene of the accident and at all times he was in the hospital prior to his death. He did not speak to anyone after the collision.

The Ivey Edwards Road crossing consists of a two-lane road crossing one set of railroad tracks. The general area around the Crossing is wooded. At the Crossing, Highway 42 is approximately one block east of the railroad tracks. Both north and south of the Crossing, the railroad tracks curve to the west. At the Crossing, there is a gravel service road along the northeast side of the track and a gravel bed along the southeast side. On November 27, 1996, a stop sign and a railroad cross-buck were located approximately eighteen feet east of the Crossing; a black and yellow railroad warning sign, approximately 360 feet east of the Crossing; and a posted speed limit of 35 miles per hour, approximately 400 feet east of the Crossing. No collisions had been reported at the Crossing, although several witnesses testified to being aware of several "near misses."

In July 1993, Defendant's Georgia Division Grade Crossing Committee determined that the Crossing might benefit from active warning signals. It is unclear from the evidence before the Court whether Defendant reported this determination to the Georgia Department of Transportation (GDOT). Nevertheless, Otis Hammock, an employee of GDOT, inspected the Crossing in January 1994, as part of GDOT's Rail Grade Crossing Safety Pro-

gram. At that time, Hammock did not recommend that active warning signals be installed at the Crossing. In December 1996, following the collision at issue here, the Crossing was again inspected, and the GDOT recommended that active warning signals be installed. The Crossing is now equipped with active warning signals.

At the time of the collision, the train engineer was Daniel B. Montgomery, and the conductor was Dana Chastain. Montgomery and Chastain were the only crew on the train; both were in the lead locomotive; Chastain was on the right or west side; Montgomery was on the left or east side. The lead locomotive was positioned with the short end forward, the normal position for the lead locomotive as it provides better visibility for the engineer and conductor. The day was clear, and ground conditions were dry. The federally mandated speed limit along the section of track at issue is 50 miles per hour for freight trains, and the speed tapes from the train indicated that it was traveling at 44 miles per hour. Both Montgomery and Chastain reported that there were no obstructions at the Crossing. Montgomery testified that he began blowing the train whistle and ringing the bell at the blow post approximately a quarter of a mile north of the Crossing and continued blowing the whistle until he reached the Crossing. Chastain also testified that Montgomery was blowing the train whistle. The locomotive headlight was on bright.

Montgomery first observed Crockett's vehicle as the vehicle approached and entered the Crossing from approximately twenty feet to the east. Montgomery testified that, although he did not know the speed at which the vehicle was traveling, it was moving fast and appeared to be trying to stop. Chastain did not see the vehicle before the collision. Montgomery applied the emergency brakes as soon as he saw Crockett's vehicle but had no time to prevent the collision. Montgomery was the only eyewitness to the collision. The vehicle was hit on the passenger side door, just forward of the center of the vehicle, and came to rest on the east side of the track, just south of the Crossing.

Jerry and Martha Huff were the first people to arrive at the scene. Martha Huff testified that, as they were driving north on Highway 42, they heard the train, but she could not recall whether they heard the train whistle. She further testified that they did not hear the collision. Jerry Huff testified that, as they traveled toward Ivey Edwards Road, he heard some sort of train noise but that he could not remember what the noise was. He further testified that he did not remember hearing the whistle but that it might have blown and he did not hear it. The Huffs saw the train, which was still moving, when they first turned off Highway 42 onto Ivey Edwards Road. At first they didn't realize anything had happened, but as they realized the train was slowing and stopping, they looked to the left and saw Crockett's vehicle. Ms. Huff called 911 on the car phone, and Mr. Huff went to the vehicle and pulled Crockett out. Mr. Huff does not remember unfastening or cutting Crockett's seat belt. Crockett appeared to be comatose and did not respond in any way to the Huffs.

The accident was investigated by Henry County Police Officer Jack P. Pinholster. Crockett had already been removed from the vehicle and was being treated by paramedics when Pinholster arrived. Crockett's vehicle was located on the southeast side of the Crossing, ninety-two feet from the apparent point of impact, and the train was stopped with the locomotive approximately a quarter to a third of a mile south of the Crossing. While at the scene, Pinholster measured a fresh, relatively straight, forty-two foot skid mark on Ivey Edwards Road east of the railroad tracks, ending before the eastern-most rail. Based on the location of the skid mark and marks on the tires of Crockett's vehicle, Pinholster believed the skid mark was made by the left rear tire of Crockett's vehicle as Crockett attempted to stop.

The Huffs told Pinholster that they heard the train whistle as they traveled along Highway 42, which parallels the railroad tracks. Pinholster indicated on his report of the accident that Crockett's view of the railroad tracks was not obstructed. Based on the damage to Crockett's vehicle, the physical evidence at the scene, and statements from the Huffs, Pinholster believed that Crockett did not stop at the stop sign, saw the train approaching and tried to stop, realized he couldn't stop in time, and then tried to beat the train through the Crossing.

Lindy Maulin lives in a mobile home near the Crossing. She usually feels the vibrations from a train before she sees or hears it. Ms. Maulin was at home on November 27, 1996, at the time of the collision. She felt the train and heard its rumble, but did not hear its whistle. She did not hear the collision or the train braking or the Lifeflight helicopter which took Crockett from the scene.

The accident was investigated by Greg Allen, district claim agent for Defendant. Allen went to the site of the collision on December 3, 1996, approximately one week after the collision. He took photographs of the area, made various measurements, and interviewed the witnesses identified in the police report as well as several "ear" witnesses who lived near the collision site. Ms. Huff told Allen that she heard the train whistle. Another woman, whose name Allen did not remember, told him she did not hear the whistle. Although Allen's photographs show the view that could be seen from an automobile stopped at the stop sign, Allen did not measure the sight distance from the Crossing.

Plaintiff, Crockett's father and personal representative of Crockett's estate, filed this wrongful death suit in the Superior Court of Henry County, alleging Defendant's negligence caused the accident which lead to Crockett's death. The case was properly removed to this Court based on diversity of citizenship. Plaintiff alleges sixteen specific items of negligence on the part of Defendant and its agents. These alleged items of negligence can be summarized as: (1) failure of Defendant to install active warning signals at the crossing; (2) failure of the crew on the train to give adequate warning by sounding the whistle or ringing the bell; (3) failure of the crew to maintain proper lookout from the train for approaching vehicular traffic; (4) failure of the crew to maintain a safe speed in light of the existing conditions; and (5) failure of Defendant to maintain an unobstructed view of the Crossing. Plaintiff seeks damages relating to the wrongful death of Crockett, including the pain and suffering of Crockett between the accident on November 27, 1996, and his death on November 30, 1996; funeral expenses and the value of the vehicle driven by Crockett and destroyed in the accident; Plaintiff's loss of support and services, loss of society and comfort, and mental pain and suffering; and the value of the life of Crockett. Plaintiff filed a motion to amend the complaint to add a claim for punitive damages based on Defendant's alleged failure to install active warning signals at the Crossing.

Defendant filed a motion for summary judgment or, in the alternative, for partial summary judgment. Defendant contends the accident was proximately caused by Crockett's own negligence in failing to stop at the Crossing. Defendant also contends it was not negligent because it had no duty to install active warning signals at public road crossings, any claim that the train was traveling too fast is preempted by federal law, the crew maintained a vigilant lookout and sounded the train whistle, the view of the tracks for a driver stopped at the stop sign was not obstructed, and the sight distance was sufficient for a vehicle to enter and clear the Crossing if no train was visible at the time the driver decided to enter the Crossing. Defendant further contends there is no evidence that Crockett, who was unconscious from the time of the accident until his death, experienced any pain or suffering and that for wrongful

death claims in Georgia, damages are limited to the full value of the life of the decedent and do not include pain and loss experienced by others.

In responding to the motion for summary judgment, Plaintiff contends whether Crockett was negligent, whether the whistle on the train was sounded, whether Defendant failed to maintain an unobstructed view, and what damages are allowed are questions for a jury. Plaintiff also contends the law is unsettled as to whether Defendant had a duty to provide active warning signals at the Crossing.

## LEGAL STANDARDS AND ANALYSIS

### I. Summary Judgment

Courts should grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears "the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of [the record] 'together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 159–60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437–38 (11th Cir.1991).

In determining whether the moving party has met its burden, the court views the evidence in the light most favorable to the party opposing the motion. *Adickes*, 398 U.S. at 158–59, 90 S.Ct. 1598. Moreover, "[r]easonable doubts as to the facts should be resolved in favor of the nonmoving party," *Borg–Warner Acceptance Corp. v. Davis*, 804 F.2d 1580, 1582 (11th Cir. 1986), "and all justifiable inferences are to be drawn in his favor," *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir.1987). "For factual issues to be considered genuine, they must have a real basis in the record."

*Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir.1993). Additionally, issues of fact are genuine only if "they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The unsupported, self-serving statements of the party opposing summary judgment are insufficient to avoid summary judgment. *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 714 (11th Cir. 1984). The moving party's failure to meet this initial burden ends the inquiry, and summary judgment should be denied.

Once the moving party has met this initial burden, the "burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark*, 929 F.2d 604, 608 (11th Cir.1991). At this point, "the non-moving party [must] go beyond the pleadings and by affidavits of [his or her] own, or by the 'depositions[,] answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Russ v. International Paper Co.*, 943 F.2d 589, 592 (5th Cir.1991) (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548), *cert. denied*, 503 U.S. 987, 112 S.Ct. 1675, 118 L.Ed.2d 393 (1992). *Accord, Four Parcels of Real Property*, 941 F.2d at 1437–38. Whether facts are material is determined by the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is not genuine if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 249–50, 106 S.Ct. 2505.

### A. Crockett's Negligence

In general, under Georgia law, "there can be no recovery of damages where the injured party has failed to use ordinary care to prevent an injury to himself, unless the injury be wilfully and wantonly inflicted upon him." *Garrett v. NationsBank*, 228 Ga.App. 114, 117, 491 S.E.2d

158 (1997). "Thus, one is bound at all times to exercise ordinary care for his own safety." *Id.* Where a plaintiff's "failure to exercise reasonable care for her own safety is the direct and immediate cause of her [injury], which danger could have been avoided by her exercise of due care, the sole proximate cause of her injury was her contributory negligence." *Id.* at 119, 491 S.E.2d 158. "Routine issues" of "the negligence of the defendant and the plaintiff, and the plaintiff's lack of ordinary care for personal safety are generally not susceptible of summary adjudication," but summary judgment may be granted "when the evidence is plain, palpable, and undisputed." *Robinson v. Kroger,* 268 Ga. 735, 748, 493 S.E.2d 403 (1997).

■■■ As relates specifically to injuries resulting from railroad accidents,

"No person shall recover damages from a railroad company for injury to himself or his property where the same is ... caused by his own negligence, provided that if the complainant and the agents of the company are both at fault, the former may recover, but damages shall be diminished by the jury in proportion to the amount of fault attributable to him."

O.C.G.A. § 46–8–291. Where the evidence shows that a plaintiff "was injured solely because of his failure to exercise ordinary care for his own safety, a verdict for the defendant [is] demanded." *Georgia Northern Railway Co. v. Dalton,* 133 Ga. App. 34, 38, 209 S.E.2d 669 (1974) (quoting *Central of Ga. R. Co. v. Brower,* 218 Ga. 525, 128 S.E.2d 926). "Questions as to diligence and negligence, including contributory negligence, being questions peculiarly for the jury, the court will decline to solve them ... except in plain and indisputable cases." *Wall v. Southern R.R. Co.,* 196 Ga.App. 483, 485, 396 S.E.2d 266 (1990) (citations omitted). "Where the evidence does not disclose ... whether or not the injured person failed to look or listen, in the absence of evidence to the contrary it is presumed that he complied with any duty that may have devolved upon him in

that regard." *Id.* at 485–86, 396 S.E.2d 266.

■■■ Georgia statutory law requires drivers of vehicles to stop "within 50 feet but not less than 15 feet from the nearest rail" where a stop sign has been erected and "shall proceed only upon exercising due care." O.C.G.A. § 40–6–141. Additionally, regardless of whether a stop sign is present, drivers of vehicles are required to stop "within 50 feet but not less than 15 feet from the nearest rail" of a railroad "and shall not proceed until he can do so safely when ... [a]n approaching train is plainly visible and is in hazardous proximity to such crossing." O.C.G.A. § 40–6–140(a)(3). "Whenever a collision occurs it is necessary for the objects involved to have been in hazardous proximity to each other immediately prior thereto." *Seaboard Coast Line R. Co. v. Mitcham,* 127 Ga. App. 102, 103, 192 S.E.2d 549 (1972). "OCGA § 40–6–140(a)(3) imposes a duty to stop at crossings if the driver *could have* seen the approaching train regardless of whether or not he did in fact see it." *Decker v. State,* 217 Ga.App. 803, 459 S.E.2d 586 (1995) (emphasis in original) (citations omitted), *cert. denied* (1995). "[B]efore it can be said in a given case that an approaching train was 'plainly visible' as a matter of law, it must appear as a matter of law that a reasonably prudent person, situated as was the motorist and exercising ordinary care for his own safety should have seen it." *Mitcham,* 127 Ga. App. at 104, 192 S.E.2d 549 (citations omitted).

The only witness to the collision was Montgomery, the train engineer. Montgomery could not say whether Crockett stopped at the Crossing, but stated that when he first saw Crockett's vehicle, it was moving fast and appeared to be trying to stop. Based on the evidence at the scene, Pinholster theorized that Crockett had not planned to stop until he saw the approaching train, attempted to stop after seeing the train, realized he would not be able to stop in time, and accelerated in an attempt

to beat the train. Defendant's experts, relying on Pinholster's report and photographs taken by Pinholster and Allen, believed that Crockett did not stop at the stop sign or that, if he did stop, he pulled out in front of the clearly visible train. Plaintiff's experts theorized that Crockett stopped and looked to the left, to the right, and back to the left before pulling out in front of the train which was not visible when Crockett looked to his right.

Testimony about the sight distance from the stop sign to the point at which an approaching train first becomes visible varies:

(1) Montgomery testified at deposition that, approximately a week before his deposition, using a "foot counter" located on the locomotive he was driving at the time, he measured the sight distance to be approximately 400 feet. In an affidavit, however, Montgomery explained that he had erred in his first measurements and that, upon remeasurement with a "wheel counter" which is more accurate, the actual sight distance to the Crossing was 850 feet.

(2) Thomas H. Vadnais, P.E., one of Defendant's experts, measured the sight distance at 875 feet. He stated that the sight distance was sufficient for someone stopped at the stop sign who saw a train when it first came into view to safely cross the track. Furthermore, he stated that "even if the sight distance was as little as 400 feet, Crockett had approximately twice the time he needed to get across the track—from a stop—before the train arrived at the crossing."

(3) G. Rex Nichelson, Jr., P.E., another of Defendant's experts, stated that a member of his firm visited the site of the collision on March 12, 1999, and measured the sight distance at 850 feet. Nichelson further stated that Crockett had an obligation to stop at the stop sign and, from the stop sign, had sufficient sight distance to enter and exit the Crossing before a train which was not visible at the time he entered the Crossing arrived at the Crossing.

(4) Stephen H. Richards, Ph.D., P.E., one of Plaintiff's experts, estimated that from the railroad tracks, he could first catch a glimpse of the Crossing at a distance of 700 to 800 feet, but that the full Crossing came into clear view at 600 feet. He acknowledged, however, that his measurements of the sight distance "were very rough measurements" taken as he walked along the track. He also testified that, assuming a train approaching the crossing at 44 or 45 miles per hour and an 18 foot car, like the one Crockett was driving, stopped at the stop sign, the driver would need to see 620 feet down the track to safely start up and completely clear the tracks before a train just out of sight arrived.

(5) James D. Varin, P.E., another of Plaintiff's experts, did not make any measurements of the sight distances but relied instead on the 400 foot sight distance of Montgomery's initial measurement. Varin acknowledged, however, that if the sight distance was different from the 400 feet he used in his calculations, Crockett could have had time to clear the crossing before the train hit him if he had stopped at the stop sign before entering the Crossing.

Regardless of the actual sight distance, the evidence of record shows that Crockett would have had time to clear the Crossing if he stopped and then entered the Crossing before the train was clearly visible. Even if it is presumed that Crockett complied with his duty to look and listen, *Wall*, 196 Ga.App. at 485–86, 396 S.E.2d 266, a finding negated by the evidence, a reasonable trier of fact could only conclude that Crockett entered the crossing after he could have seen the approaching train. The hypotheses of Plaintiff's witnesses to the contrary are clearly based upon an inaccurate measurement. Regardless of whether Crockett stopped at the stop sign, he violated Georgia statutory law by proceeding through the crossing, O.C.G.A. § 40–6–141, and his injuries were caused

by his "failure to exercise ordinary care for his own safety." *Dalton*, 133 Ga.App. at 38, 209 S.E.2d 669.

### B. *Defendant's Negligence*

#### 1. *Duty to Install Active Warning Signals*

[10] "In 1973, the [Georgia Code of Public Transportation (GCPT) ], O.C.G.A. § 32–1–1 *et seq.*, was enacted to revise, classify, consolidate and repeal other laws relating to all public roads and bridges, and to establish new laws relating thereto." *Evans Timber Co., Inc. v. Central of Georgia R.R. Co.*, 239 Ga.App. 262, 263, 519 S.E.2d 706 (1999) (citations omitted).

> OCGA §§ 32–6–50 and 32–6–51(a) ... place the exclusive duty in the governmental body to install and maintain traffic control devices on public roads (including railroad crossings), and ... statutorily prohibit private entities, including railroads, from placing traffic control devices on public roads. An exception is enumerated with respect to railroad crossings at grade on the state highway system, at such crossings the Department of Transportation (DOT) is required to place and maintain traffic control devices on the public road and the railroad is required to erect and maintain a railroad crossbuck sign.

*Id.* at 263–64, 519 S.E.2d 706 (quoting *Kitchen v. CSX Transp.*, 265 Ga. 206, 453 S.E.2d 712 (1995) (ellipses in original)). "The GCPT delegates management and control of grade crossings, traffic control devices and signals to the governmental entity because they are part of the public road." *Id.* at 264, 519 S.E.2d 706. "Likewise, the GCPT delegates responsibility for the installation of protective devices on a public road to the governmental entity." *Id.* at 265, 519 S.E.2d 706.

> 'Protective devices' means gates, flashing light signals, and similar devices or combinations thereof, together with necessary appurtenances, to be installed or in operation at any grade crossing and

which comply with the safety standards determined by the department as being adequate at that time for the protection of traffic.

*Id.* "Thus, the governmental entity responsible for the public road orders the installation of protective devices." *Id.* "After the protective device has been ordered and approved by the governmental entities, the railroad has a duty to install the device." *Id.* "[T]he statute expressly prohibits a railroad from taking unilateral action and voluntarily installing protective devices." *Id.* "The GCPT precludes a common-law cause of action against a railroad for the failure to install adequate protective devices at a grade crossing on a public road where the railroad has not been requested to do so by the appropriate governmental entity." *Id.* at 266, 519 S.E.2d 706. "The legislature clearly delegated responsibility for the public road, including traffic control devices, warning signals, and protective devices, to the governmental entities and removed any such responsibility from private parties." *Id.* at 267, 519 S.E.2d 706. *See also, CSX Transp. v. Trism Specialized Carriers*, 182 F.3d 788, 792 (11th Cir.1999) (citing *Kitchen* and *Evans Timber* in holding that "§§ 32–6–50 and 32–6–51 of the GCPT statutorily overrule the state common law cause of action against railroads for negligent failure to install adequate warning devices at public grade crossings"), *reh'g, en banc, denied*, 198 F.3d 265 (1999).

Here, as in *Evans Timber*, "the railroad had not been asked to install a protective device," *Evans Timber*, 239 Ga.App. at 265, 519 S.E.2d 706, and had no duty to install one.

[11] Plaintiff contends Defendant assumed the duty to evaluate and upgrade its crossings by identifying crossings that needed active warning signals and that Defendant breached this duty by failing to take any further action after having identified the Crossing as one that needed active warning signals. In making this contention, Plaintiff relies on the

Good Samaritan Doctrine: 'One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercises reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.'

*Finley v. Lehman,* 218 Ga.App. 789, 790, 463 S.E.2d 709 (1995) (quoting *Restatement (2d) of Torts,* § 324A, which was specifically adopted by the Georgia Supreme Court in *Huggins v. Aetna Casualty & Surety Co.,* 245 Ga. 248, 264 S.E.2d 191 (1980)). "Section 342A imposes liability only where a party has in fact undertaken to render services. It does not impose liability based upon the failure to render services which should have been undertaken." *Id.* at 791, 463 S.E.2d 709.

The evidence shows that, in 1993, Defendant determined that the Crossing might need additional warning signals. GDOT inspected the crossing and determined that active warning signals were not needed. Under the GCPT, a private party cannot install a warning device at a public railroad crossing without a request from the GDOT. *Evans Timber,* 239 Ga.App. at 265, 519 S.E.2d 706. Because the governmental entity responsible for the Crossing determined that active warning signals were not needed at the Crossing, Defendant cannot be held liable for not installing them.

## 2. *Failure to Maintain Proper Lookout*

■ Engineers are required to "keep and maintain a constant and vigilant lookout along the track ahead" of the engine after reaching the blowpost "farthest removed from the crossing, and while ap-

proaching the crossing." O.C.G.A. § 46–8–190(b).

On November 27, 1996, Montgomery was looking directly out the front of the train from the left or east side of the locomotive prior to the collision, and Chastain was looking out the front of the train from the right or west side of the locomotive. Montgomery saw Crockett's vehicle as soon as it could have been seen from the locomotive.

The undisputed evidence of record shows that Montgomery and Chastain were maintaining a proper lookout from the train.

## 3. *Failure to Maintain Safe Speed*

■ The federal Railroad Safety Act of 1970 (FRSA) "directs the Secretary of Transportation to study and develop solutions to safety problems posed by grade crossings." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 661–62, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). States were "permitted to 'adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement.'" *Id.* at 662, 113 S.Ct. 1732 (quoting FRSA § 434). "Federal regulations issued by the Secretary pursuant to FRSA and codified at 49 C.F.R. § 213.9(a) (1992) set maximum allowable operating speeds for all freight and passenger trains for each class of track on which they travel." *Id.* at 673, 113 S.Ct. 1732. "[T]he limits were adopted only after the hazards posed by track conditions were taken into account." *Id.* at 674, 113 S.Ct. 1732. Thus, "§ 213.9(a) should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings." *Id.* at 675, 113 S.Ct. 1732. Excessive speed claims based on state law are pre-empted by the regulations in 49 C.F.R. § 213.9(a). *Id.See also, Michael v. Norfolk Southern Ry. Co.,* 74 F.3d 271, 273 (11th Cir.1996)

(holding that "[a]ny state law claim based on the train's alleged excessive speed is preempted by federal law").

Plaintiff's state law negligence claims based on the train's allegedly excessive speed are pre-empted by federal regulations adopted pursuant to the FRSA.

### 4. *Failure to Maintain an Unobstructed View*

"[W]here there is evidence, even though skimpy, that obstructions did exist along the roadway and the railroad right of way," the question of whether a reasonably prudent person should have seen the train may not be answered by the court. *Seaboard Coast Line R.R. Co. v. Mitcham,* 127 Ga.App. 102, 104, 192 S.E.2d 549 (1972). "Of course, if no obstructions existed, if the train was in fact actually visible, and if [the plaintiff] actually saw it or in the exercise of ordinary care should have seen it, then he cannot recover." *Id.*

Montgomery testified that, although the Crossing itself was clearly visible from 850 feet, trees blocked the view of the road leading to the Crossing. Nichelson testified that the vegetation around the Crossing was not an issue; that, because Crockett was required by law to stop at the stop sign, only vegetation blocking the view from the stop sign was relevant.

Varin expressed a belief that the collision was, in part, the result of "[t]he very limited sight distance available to drivers due to the curvature of the tracks and the proximity of the trees and brush to the tracks in the vicinity of the curve." Richards stated that motorist's views of approaching trains at the Crossing are "severely limited by vegetation and the combination of track and roadway geometry." Both, however, based their opinions on a 400 foot sight distance. Additionally, Richards based his opinion on calculations of a "critical decision point," the point at which a motorist must decide to initiate a stop or risk a collision with an approaching train. Richards stated that, with a posted speed limit of 35 miles per hour, the critical decision point was 212 feet from the Crossing and that, at that distance, "a motorist could only see approximately 23 feet down the tracks looking in the direction of an approaching southbound train." Richards' calculations and opinion, however, failed to consider the stop sign at the Crossing, the presence of which required all motorists to stop at the Crossing.

The undisputed evidence before the Court shows that, for a vehicle stopped at the stop sign on the east side of the Crossing, the sight distance for an approaching train was at least 600 feet and probably more than 800 feet. Although vegetation may have blocked a driver's view of an approaching train from the road leading to the Crossing, every driver had a legal duty to stop at the stop sign, and the sight distance from the stop sign was sufficient to allow a driver to safely cross the tracks before a train, which was out of sight when the driver stopped and looked, reached the Crossing. Additionally, there is no evidence that the offending vegetation was located on Defendant's right-of-way or that Defendant had any authority to control vegetation not located on its right-of-way.

### 5. *Failure to Sound Whistle*

In Georgia, railroad companies are required to erect blowposts at all intersections of the rail line "with any public road or street used by the public generally in crossing the tracks of the railway." O.C.G.A. § 46–8–190(a). Engineers operating locomotives of trains moving over the tracks of the railroad are required to sound the train whistle when they reach the blowposts, as a signal of approach to the crossing. O.C.G.A. § 46–8–190(b).

"Where a number of witnesses testify positively that a train whistle was blown on the occasion in question, and [others], when asked, 'Did you hear the whistle?' answered, 'Not that I remember,' such answer is equivalent to testifying that he did not hear the train whistle, and the

question at issue thus being supported on one side by positive evidence and on the other side by negative evidence, is issuable and not to be determined by the court as a matter of law." *Atlantic Coast Line R.R. Co. v. Heath,* 109 Ga.App. 422, 423, 136 S.E.2d 387 (1964).

Both Chastain and Montgomery testified that Montgomery began blowing the horn and ringing the bell at the blowpost.

At the scene of the accident, the Huffs told Pinholster that they heard the train whistle before they turned off of Highway 42 onto Ivey Edwards Road. Later they told Allen, who investigated the accident for Defendant, that they heard the train whistle.

At deposition, Mr. Huff testified that, while he was traveling along Highway 42 he heard a train noise which he thought sounded like "a couple of boxcars hitting." He stated, "I knew it was a train." Later, he stated that he did not recall hearing a train whistle, but acknowledged, "It could have blowed and I didn't hear it" because his "mind was not on a train" and he and Ms. Huff "were talking about something else." Mr. Huff testified that Ms. Huff "said she might have heard [the train whistle], but she was never real sure. She was kind of like I was, but I think she at first thought that she heard a train whistle." He indicated that "[a]fter the accident she said she felt like she did [hear the whistle] and then later said she couldn't be sure."

Ms. Huff testified at deposition that as she and Mr. Huff were driving north on Highway 42 and talking, "It seems like we remember hearing the train. I don't know what made me think it, but you know how when you're talking, you don't really think about things like that, but we turned in left onto Ivey Edwards. I don't know if one of us made the statement that we heard the train. One way or another, I can't really remember, you know, because we were subconsciously thinking about it.... It seems like we both realized that the train was going to stop us from going across the crossing." When asked, "And sitting here today, ... two-and-a half years at this point, was it a whistle that you were thinking you're hearing or was it the sound of the train or what was it that indicated—," Ms. Huff replied, "I honestly can't tell you. I don't remember.... I would tell you if I knew."

Ms. Maulin testified at deposition that she did not hear the whistle and suggested that she was consciously aware of not hearing the whistle although she was aware of the train. This is the same witness who did not hear the collision or the helicopter. The Court finds that the evidence of record is insufficient to create a genuine issue of fact as to whether the train's whistle was not blown at the blowposts.

However, even it there were genuine issues as to whether the train whistle was blowing at or immediately before the time of the collision, in light of the finding that Crockett failed to exercise ordinary care for his own safety, the issue would be immaterial.

### C. *Crockett's Pain and Suffering*

 "The fright, shock, and mental suffering experienced by an individual due to wrongful acts of negligence will authorize a recovery where attended with physical injury." *Monk v. Dial,* 212 Ga.App. 362, 441 S.E.2d 857 (1994), *cert. denied* (1994). There is no requirement that the physical injury precede the mental pain and suffering. *Id.* Where the evidence is sufficient for a reasonable trier of fact to infer that a driver was aware of an impending crash, "the amount of damages becomes a matter for the enlightened conscience of the jury." *Id.* at 363, 441 S.E.2d 857.

Plaintiff contends the skid marks reported by Pinholster show that Crockett knew of the impending collision and experienced fright and mental suffering prior to the collision. The issue of whether the skid marks were made by Crockett's vehicle is

disputed since Varin, Plaintiff's expert, contends they could not have been made by Crockett's vehicle which was equipped with anti-lock brakes. If the disputed skid marks were, in fact, made by Crockett's vehicle, as contended by Plaintiff, then Crockett's own negligence in failing to stop at the stop sign was the legal cause of the collision and his negligence in failing to stop, look, and listen prohibits any recovery.[1] If the skid marks were not made by Crockett's vehicle, there is no evidence he was aware of the impending collision or that he could have experienced fright or mental suffering.

### D. *Plaintiff's Individual Claims*

Although "OCGA § 19-7-1(c)(1) provides that parents of a deceased child shall be entitled to recover the full value of the life of the child," *South Fulton Medical Center v. Poe,* 224 Ga.App. 107, 112, 480 S.E.2d 40 (1996), *cert. denied* (1997), "parents not present at an incident when serious injuries were inflicted on their child by the wilful and wanton act of a defendant do not have an independent right of action to recover for emotional distress and mental suffering flowing from the parents learning of the injuries to the child," *Howard v. Bloodworth,* 137 Ga.App. 478, 224 S.E.2d 122 (1976). *See also, Bell v. Sigal,* 129 Ga.App. 249, 250, 199 S.E.2d 355 (1973) (holding that parents may not recover for their own anxiety, worry, mental suffering, grief, or wounded feelings caused by injuries to or the death of their child).

Plaintiff was not present at the collision, and there is no evidence that the collision resulted from a wilful or wanton act of Defendant.

### II. *Amendment of Complaint*

After the time for amending as a matter of course has expired, "a party may amend the party's pleading only by leave of court; and leave shall be freely given when justice so requires." Fed. R.Civ.P. 15(a). "While the district court is accorded discretion in arriving at its decision, a justifying reason must be apparent for denial of a motion to amend." *Nolin v. Douglas County,* 903 F.2d 1546, 1550 (11th Cir.1990). Among the factors that may be considered by the court in determining whether to grant a motion to amend is the futility of the amendment. *Id.*

Plaintiff seeks to amend the complaint to add a claim for punitive damages based on Defendant's failure to install active warning signals at the Crossing after it had notice that the Crossing was hazardous. Defendant contends the proposed amendment would be futile as it had no duty to install active warning signals at any public crossing.

As shown above in Section I.B.1., Defendant had no duty to install active warning signals at the Crossing. Permitting Plaintiff's proposed amendment to the complaint would therefore be futile.

### CONCLUSION

Having found that Crockett failed to exercise ordinary care for his own safety, that there is no evidence of Defendant's negligence, that there is no evidence of Crockett's pain and suffering, and that Plaintiff cannot recover for his own pain and suffering, the Court GRANTS Defendant's motion for summary judgment [23-1] and DENIES Defendant's motion for partial summary judgment [23-2], Plaintiff's motion to amend [20-1], and Plaintiff's motion for oral argument [32-1].

---

1. The 42 foot skidmark commenced within and extended beyond the 35 foot (50 to 15 foot) interval within which Crockett was required by law to stop, *see* O.C.G.A. §§ 40-6-140, 141, and actually up to the apparent point of impact. It would obviously be impossible for a car after stopping at the 50 foot distance to start, proceed 15 feet and then lay down a 42 foot skidmark. The physical evidence demands a finding that Crockett did not stop within the legally prescribed zone.

**Clerk of Court** is directed to enter judgment for Defendant. This closes the case.